UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE COTE

DOC # _____

| | |
|---|---|
| DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CREDIT LOCAL, NEW YORK BRANCH; NEW YORK LIFE INSURANCE COMPANY; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION; THE MAINSTAY FUNDS; MAINSTAY VP SERIES FUND, INC.; TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA; TIAA-CREF LIFE INSURANCE COMPANY; TIAA GLOBAL MARKETS, INC.; COLLEGE RETIREMENT EQUITIES FUND; and THE TIAA-CREF FUNDS, | Case No. CV 1259 |
| | ECF Case |
| | 11-cv-7165 MRP-MANx |
| Plaintiffs, | |
| v. | **NOTICE OF REMOVAL** |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING LP; CWALT, INC.; CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE CAPITAL MARKETS, LLC; ANGELO MOZILO; DAVID A. SAMBOL; BANK OF AMERICA CORP.; BAC HOME LOANS SERVICING, L.P.; NB HOLDINGS CORPORATION; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; THOMAS K. McLAUGHLIN; THOMAS H. BOONE; and JEFFREY P. GROGIN, | |
| Defendants. | |



TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:

PLEASE TAKE NOTICE that Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., CWALT, Inc., CWABS, Inc., CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corporation, Countrywide Home Loans Servicing LP, and N. Joshua Adler (together, the "Countrywide Defendants") hereby remove Case No. 650185, filed with the Supreme Court of the State of New York, County of New York, and all claims and causes of action therein (the "Action"), to the United States District Court for the Southern District of New York.  As grounds for removal, the Countrywide Defendants state as follows:

## I.      JURISDICTION

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) because this Action is related to two pending bankruptcy proceedings, and all claims and causes of action in the Action may be removed to this Court under 28 U.S.C. § 1452.  This Court is part of the "district and division" embracing the place where this Action was filed— New York City, New York, in New York County, New York.

## II.      PROCEDURAL HISTORY AND TIMELINESS OF REMOVAL

2.      On or about January 24, 2011, Plaintiffs Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local New York Branch, New York Life Insurance Company, New York Life Insurance and Annuity Corporation, The Mainstay Funds, Mainstay VP Series Fund, Inc., Teachers Insurance and Annuity Association of America, TIAA-CREF Life Insurance Company, TIAA Global Markets, Inc., College Retirement Equities Fund, and The TIAA-CREF Funds (together, the "Plaintiffs"), filed a summons (the "Summons") and a complaint (the "Complaint") in this action in the Supreme Court of the State of New York in the

2

County of New York. The case entitled *Dexia Holdings, et al. v. Countrywide Financial Corporation, et al.*, was assigned Case Number 650185.

3.      On January 28, 2011, the Summons and Complaint were served on the Countrywide Defendants.[1] A copy of all process, pleadings, and orders in the Action and served on the Countrywide Defendants is attached hereto as Exhibit 1.

4.      The Complaint alleges, among other things, that certain prospectuses and other offering materials filed in connection with residential mortgage-backed securities ("MBS") sold by one or more of the Countrywide Defendants, and identified by Plaintiffs in Paragraph 4 and Exhibit 1 of the Complaint, contained misstatements and omissions in violation of Section 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l* and 77o, as well as the common law. The Countrywide Defendants dispute that they have any liability whatsoever to Plaintiffs.

5.      The Countrywide Defendants' time to answer the Complaint has not expired and none of the Defendants to the Action have served or filed an answer.

6.      No motions or other proceedings in this Action are pending in the Supreme Court of New York of New York Country.

7.      This notice of removal is timely under 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3) because it is being filed within thirty (30) days after service of the Summons and the Complaint.

### III.      REMOVAL IS PROPER UNDER 28 U.S.C. § 1452

8.      Removal is proper under 28 U.S.C. § 1452, which provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where

---

[1] Defendant N. Joshua Adler was not served until February 8, 2011.

such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Title 28 U.S.C. § 1334, in turn, confers jurisdiction upon this Court to hear all civil proceedings that are "related to cases under title 11," which is the United States Bankruptcy Code.

9.       In their Complaint, Plaintiffs allege that they purchased MBS from, among other trusts, CWALT Mortgage Pass-Through Trust 2005-J14 ("2005-J14 Trust"), CWALT Mortgage Pass-Through Trust 2006-J1 ("2006-J1 Trust"), CWALT Mortgage Pass-Through Trust 2006-OC7 ("2006-OC7 Trust"), and CHL Mortgage Pass-Through Trust 2005-HYB3 ("2005-HYB3 Trust"). Complaint ¶ 4, Complaint Exhibit 1.

10.       The MBS issued by the 2005-J14 Trust, the 2006-J1 Trust, and the 2006-OC7 Trust are backed in part by loans originated not by any Countrywide-related entity, but rather by American Home Mortgage ("AHM"). Certain of the Countrywide Defendants entered into an agreement (the "AHM Purchase Agreement") with AHM in connection with the purchase of the mortgage loans originated by AHM. The Purchase Agreement applies to, among other things, the purchase of the AHM loans that back the MBS issued by the 2005-J14 Trust, the 2006-J1 Trust, and the 2006-OC7 Trust.

11.       On August 6, 2007, AHM filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. *See In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047-CSS (Bankr. D. Del. filed Aug. 6, 2007).

12.       In accordance with the provisions of the AHM Purchase Agreement and applicable law, one of the Countrywide Defendants, Countrywide Home Loans, Inc. ("CHL"), has claims against AHM for indemnification that arise out of this Action (the "AHM

4

Indemnification Claims"). CHL filed a proof of claim for the AHM Indemnification Claims that is currently pending in the bankruptcy proceedings of AHM.

13.    In accordance with the provisions of the AHM Purchase Agreement and applicable law, CHL has claims against AHM for the repurchase of mortgage loans that underlie a portion of the 2005-J14 Trust, the 2006-J1 Trust, and the 2006-OC7 Trust (the "AHM Repurchase Claims"). CHL filed a proof of claim for the Repurchase Claims that is currently pending in the bankruptcy proceeding of AHM.

14.    Consequently, this action is "related to" the bankruptcy proceeding of AHM because AHM owes CHL obligations that, as a result of the costs and expenses incurred and to be incurred by CHL to defend this Action and any judgment sought to be entered against CHL, could affect the estate of the debtor AHM. As such, this Court has original jurisdiction under 28 U.S.C. §§ 1334(b) and 1452(a).

15.    The MBS issued by the 2005-HYB3 Trust are backed in part by loans originated not by any Countrywide-related entity, but rather by Aegis Mortgage Corporation ("AMC"). Certain of the Countrywide Defendants entered into an agreement (the "AMC Purchase Agreement") with AMC in connection with the purchase of the mortgage loans originated by AMC. The Purchase Agreement applies to, among other things, the purchase of the AMC loans that back the MBS issued by the 2005-HYB3 Trust.

16.    On August 13, 2007, AMC filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. *See In re Aegis Mortgage Corp., et. al.*, Case No. 07-11119-BLS (Bankr. D. Del. filed Aug. 13, 2007).

5

17.     In accordance with the provisions of the AMC Purchase Agreement and applicable law, CHL, has claims against AMC for indemnification that arise out of this Action (the "AMC Indemnification Claims").  CHL filed a proof of claim for the AMC Indemnification Claims that is currently pending in the bankruptcy proceedings of AMC.

18.     In accordance with the provisions of the AMC Purchase Agreement and applicable law, CHL has claims against AMC for the repurchase of mortgage loans that underlie a portion of the 2005-HYB3 Trust (the "AMC Repurchase Claims").  CHL filed a proof of claim for the Repurchase Claims that is currently pending in the bankruptcy proceeding of AMC.

19.     Consequently, this action is "related to" the bankruptcy proceeding of AMC because AMC owes CHL obligations that, as a result of the costs and expenses incurred and to be incurred by CHL to defend this Action and any judgment sought to be entered against CHL, could affect the estate of the debtor AMC.  As such, this Court has original jurisdiction under 28 U.S.C. §§ 1334(b) and 1452(a).

### IV.     SECTION 22(a) DOES NOT BAR REMOVAL

20.     The bankruptcy removal statute controls over the anti-removal provision of Section 22(a) of the Securities Act. *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 108 (2d Cir. 2004) ("[W]e hold that generally non-removable claims brought under the Securities Act of 1933 may be removed to federal court if they come within the purview of 28 U.S.C. § 1452(a), which confers federal jurisdiction over claims that are related to a bankruptcy case."); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 572 F. Supp. 2d 314, 316 (E.D.N.Y. 2008) ("To the extent that there is jurisdiction under the Bankruptcy Code, it is clear that such jurisdiction trumps the non-removal provision of the 1933 Act.").

21.     Consent to removal is not required under the bankruptcy removal statute. *See* 28 U.S.C. § 1452(a).  In any event, all defendants join in this Notice of Removal and consent to the removal of this action to this Court, subject to and without waiving any defenses and rights available to them.

22.     The Removing Defendants are entitled to have this case heard in federal court rather than in state court because the case is related to bankruptcy proceedings.

## V.     PROCEDURAL REQUIREMENTS AND LOCAL RULES

23.     This is not a "core proceeding" under 28 U.S.C. § 157(b)(2).  As required by Fed. R. Bankr. P. 9027(a)(1), the Countrywide Defendants state that they do not consent to entry of final order of judgment by any bankruptcy judge.

24.     Pursuant to 28 U.S.C. § 1446(d), the Countrywide Defendants will serve a copy of this Notice of Removal on counsel for Plaintiff and will file a copy with the Clerk of the Supreme Court of New York, County of New York.  Pursuant to 28 U.S.C. § 1446(a), and attached hereto as Exhibit 2, is a copy of a Notice of Filing of Notice of Removal, which will be filed with the Clerk of the Supreme Court of New York, County of New York.

25.     The Countrywide Defendants sign this Notice of Removal pursuant to Rule 11 of the Federal Rules of Civil Procedure and Rule 9011 of the Federal Rules of Bankruptcy Procedure.

7

Dated: February 23, 2011                Respectfully submitted,

_Mark Holland_

Mark Holland (MH6494)
mholland@goodwinprocter.com
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel. (212) 813-8800

Brian E. Pastuszenski (*pro hac vice* application forthcoming)
bpastuszenski@goodwinprocter.com
Inez H. Friedman-Boyce (*pro hac vice* application forthcoming)
ifriedmanboyce@goodwinprocter.com
Brian C. Devine (*pro hac vice* application forthcoming)
bdevine@goodwinprocter.com
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02110
Tel. (617) 570-1000

*Attorneys for Defendants Countrywide Financial Corporation,*
*Countrywide Home Loans, Inc., Countrywide Home Loans*
*Servicing, LP, CWALT, Inc., CWMBS, Inc., CWABS, Inc.,*
*CWHEQ, Inc., Countrywide Capital Markets, LLC, Countrywide*
*Securities Corporation and N. Joshua Adler*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CRÉDIT LOCAL, NEW YORK BRANCH; NEW YORK LIFE INSURANCE COMPANY; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION; THE MAINSTAY FUNDS; MAINSTAY VP SERIES FUND, INC.; TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA; TIAA-CREF LIFE INSURANCE COMPANY; TIAA GLOBAL MARKETS, INC.; COLLEGE RETIREMENT EQUITIES FUND; and THE TIAA-CREF FUNDS, | Index No. |
| Plaintiffs, | |
| v. | **SUMMONS** |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING LP; CWALT, INC.; CWMBS, INC.; CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE CAPITAL MARKETS, LLC; ANGELO MOZILO; DAVID A. SAMBOL; BANK OF AMERICA CORP.; BAC HOME LOANS SERVICING, L.P.; NB HOLDINGS CORPORATION; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; THOMAS K. McLAUGHLIN; THOMAS H. BOONE; and JEFFREY P. GROGIN, | **Date Index No. Purchased:** <br><br> January 24, 2011 |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS:

| | | |
|---|---|---|
| **Countrywide Financial Corporation**<br>4500 Park Granada<br>Calabasas, CA 91302 | **Countrywide Homes Loans, Inc.**<br>4500 Park Granada<br>Calabasas, CA 91302 | **Countrywide Homes Loans Servicing LP (now doing business as BAC Home Loans Servicing, LP)**<br>1 Bryant Park<br>New York, NY 10036 |
| **CWALT, Inc.**<br>4500 Park Granada<br>Calabasas, CA 91302 | **CWMBS, Inc.**<br>4500 Park Granada<br>Calabasas, CA 91302. | **CWABS, Inc.**<br>4500 Park Granada<br>Calabasas, CA 91302 |
| **CWHEQ, Inc.**<br>4500 Park Granada<br>Calabasas, CA 91302 | **Countrywide Securities Corporation**<br>4500 Park Granada<br>Calabasas, CA 91302 | **Countrywide Capital Markets, LLC**<br>4500 Park Granada<br>Calabasas, CA 91302 |
| **Angelo Mozilo**<br>2816 Ladbrook Way<br>Thousand Oaks, CA 91361 | **David A. Sambol**<br>23807 Long Valley Road<br>Hidden Hills, CA 91302 | **Bank of America Corp.**<br>1 Bryant Park<br>New York, NY 10036 |
| **BAC Home Loans Servicing, LP**<br>1 Bryant Park<br>New York, NY 10036 | **NB Holdings Corporation, c/o The Corporation Trust Company**<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | **Stanford L. Kurland**<br>6005 William Bent Road<br>Hidden Hills, CA 91302 |
| **David A. Spector**<br>1404 Bernard Way<br>Martinez, CA 94553 | **Eric P. Sieracki**<br>3761 Berry Drive<br>Studio City, CA 91604 | **N. Joshua Adler**<br>3400 Cordova Drive<br>Calabasas, CA 91302 |
| **Ranjit Kripalani**<br>815 John Street<br>Manhattan Beach, CA 90266 | **Jennifer S. Sandefur**<br>6885 Coyote Canyon Road<br>Somis, CA 93066 | **Thomas H. Boone**<br>4163 Oak Place Drive<br>Westlake Village, CA 91362-5129 |
| **Thomas K. McLaughlin**<br>1336 Lynnmere Drive<br>Thousand Oaks, CA 91360-1945 | **Jeffrey P. Grogin**<br>25080 Ashley Ridge Road<br>Hidden Hills, CA 91302-1100 | |

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve notice of appearance,

on the plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for relief demanded herein.

Venue is proper in this Court because Plaintiffs and certain Defendants maintain their principal places of business in New York County.

Dated: January 24, 2011                    Respectfully submitted,

                                           **BERNSTEIN LITOWITZ BERGER
                                           & GROSSMANN LLP**

                                           Gerald H. Silk
                                           David L. Wales
                                           Jai K. Chandrasekhar
                                           Lauren A. McMillen
                                           Justinian Doreste
                                           1285 Avenue of the Americas, 38th Floor
                                           New York, NY 10019
                                           Tel: (212) 554-1400
                                           Fax: (212) 554-1444
                                           jerry@blbglaw.com
                                           dwales@blbglaw.com
                                           jai@blbglaw.com
                                           lauren@blbglaw.com
                                           justinian@blbglaw.com

                                            -and-

                                           Blair Nicholas
                                           12481 High Bluff Drive, Suite 300
                                           San Diego, CA 92130
                                           Tel: (858) 793-0070
                                           Fax: (858) 793-0323
                                           blairn@blbglaw.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CRÉDIT LOCAL, NEW YORK BRANCH; NEW YORK LIFE INSURANCE COMPANY; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION; THE MAINSTAY FUNDS; MAINSTAY VP SERIES FUND, INC.; TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA; TIAA-CREF LIFE INSURANCE COMPANY; TIAA GLOBAL MARKETS, INC.; COLLEGE RETIREMENT EQUITIES FUND; and THE TIAA-CREF FUNDS, | Index No. |
| | |
| Plaintiffs, | **COMPLAINT** |
| | |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING LP; CWALT, INC.; CWMBS, INC.; CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE CAPITAL MARKETS, LLC; ANGELO MOZILO; DAVID A. SAMBOL; BANK OF AMERICA CORP.; BAC HOME LOANS SERVICING, L.P.; NB HOLDINGS CORPORATION; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; THOMAS K. McLAUGHLIN; THOMAS H. BOONE; and JEFFREY P. GROGIN, | |
| | |
| Defendants. | |

---

## TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ........................................................................1

II.     JURISDICTION AND VENUE ......................................................................6

III.    THE COMMON LAW FRAUD PARTIES ....................................................7

        A.      Plaintiffs..............................................................................................7

        B.      Countrywide Defendants ....................................................................9

        C.      Bank Of America Defendants ...........................................................13

IV.     FACTS RELEVANT TO PLAINTIFFS' COMMON LAW FRAUD CLAIMS .............14

        A.      Countrywide Misrepresents Its Mortgage Loan Underwriting Guidelines............14

        B.      The Securitization Process ................................................................18

        C.      Countrywide Abandoned Its Underwriting Guidelines By Approving Extremely Risky Loans Through "Shadow Guidelines" And Other Undisclosed Exceptions .........................................................................24

                1.      Countrywide's "Matching" Strategy Ensured That Countrywide's Underwriting Guidelines Were The "Most Aggressive" Guidelines In The Market ........................................................30

                2.      Countrywide's Secondary Markets Structured Loan Desk Abandoned All Underwriting Standards, Approving Any Loan, Regardless Of Its Credit Risk, As Long As The Loan Could Be Resold and Securitized..............................................................33

                3.      The Risky Use Of Exceptions Was Well Known Within Countrywide But Was Concealed From Plaintiffs And Other Investors In The Certificates ...........................................36

        D.      Defendants Knew That Countrywide's Stated Income Loan Products, Including "Prime" Pay-Option ARM Loans, Were Not Prudently Underwritten And Were Likely To Suffer Significant Defaults And Deficiencies, But Concealed These Facts From Plaintiffs And Other Investors In The Certificates ...........................................41

        E.      Countrywide Retained The Best Quality Loans For Its Own Portfolio, Selling Only The Riskiest Loans To Plaintiffs And Other Investors.........51

        F.      Countrywide Pressured Appraisers To Submit Falsified Appraisal Reports.........52

G.      The Credit Ratings Assigned To Countrywide's Certificates Materially Misrepresented The Credit Risk Of The Certificates .............................................58

H.      Countrywide Failed To Ensure That Title To The Underlying Loans Was Effectively Transferred ..........................................................................................62

V.     PLAINTIFFS' INVESTMENT IN THE COUNTRYWIDE CERTIFICATES ...............66

VI.    DEFENDANTS' FALSE AND MISLEADING MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ..............71

A.      Defendants Made False And Misleading Statements Regarding Countrywide's Underwriting Guidelines ...............................................................72

B.      Defendants Made Untrue Statements And Omissions Regarding Appraisals And LTV Ratios..................................................................................76

C.      Defendants Materially Misrepresented The Accuracy Of The Credit Ratings Assigned To The Certificates ...................................................................79

D.      Defendants Materially Misrepresented Countrywide's Transfer Of Good Title To The Mortgage Loans To The Issuing Trusts...........................................80

VII.   BECAUSE OF DEFENDANTS' FRAUDULENT CONDUCT, PLAINTIFFS HAVE SUFFERED LOSSES ON THEIR PURCHASES OF CERTIFICATES .............80

VIII.  AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA IS VICARIOUSLY LIABLE FOR COUNTRYWIDE'S ACTIONS...................................84

IX.    CAUSES OF ACTION FOR FRAUD........................................................................87

FIRST CAUSE OF ACTION  (Common Law Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants) .......................................................................................................................87

SECOND CAUSE OF ACTION  (Fraudulent Inducement Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants) .......................................................................................................................89

THIRD CAUSE OF ACTION  (Aiding And Abetting Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Home Loans Servicing, Countrywide Capital Markets, The Depositor Defendants, Mozilo And Sambol)...........................................................................................................91

FOURTH CAUSE OF ACTION  (Successor And Vicarious Liability Against The Bank Of America Defendants) ...........................................................................................92

X.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT AND FOR NEGLIGENT MISREPRESENTATION.......................................................................94

A.   Overview Of The Securities Act Claims ..............................................95

B.   Additional Defendants ......................................................................96

C.   Tolling Of The Statute Of Limitations.................................................99

D.   Defendants' Materially False Misstatements And Omissions In The
     Offering Documents.......................................................................102

     1.   Defendants Made False And Misleading Statements Regarding
          Countrywide's Underwriting Guidelines...................................103

     2.   Defendants Made Untrue Statements And Omissions Regarding
          Appraisals And LTV Ratios....................................................105

     3.   Defendants Materially Misrepresented The Accuracy Of The
          Credit Ratings Assigned To The Certificates ..........................107

     4.   Defendants Materially Misrepresented Countrywide's Transfer Of
          Good Title To The Mortgage Loans To The Issuing Trusts...................108

FIFTH CAUSE OF ACTION  For Violation Of Section 11 Of The Securities Act
     (Against The Individual Securities Act Defendants, The Depositor Defendants,
     And Countrywide Securities Corporation) ..............................................109

SIXTH CAUSE OF ACTION  For Violation Of Section 12(a)(2) Of The Securities Act
     (Against Countrywide Securities Corporation And The Depositor Defendants) ...........111

SEVENTH CAUSE OF ACTION  For Violation Of Section 15 Of The Securities Act
     (Against The Individual Securities Act Defendants, Mozilo, Sambol, Countrywide
     Financial Corp., Countrywide Securities Corporation, Countrywide Home Loans,
     Countrywide Servicing, And Countrywide Capital Markets)..........................113

EIGHTH CAUSE OF ACTION  (Negligent Misrepresentation Against Mozilo, Sambol,
     Countrywide Financial Corp., Countrywide Securities Corporation, Countrywide
     Home Loans, Countrywide Servicing, And Countrywide Capital Markets)...................114

NINTH CAUSE OF ACTION  (Successor And Vicarious Liability Against The Bank Of
     America Defendants For The Securities Act And Negligent Misrepresentation
     Claims)...............................................................................117

PRAYER FOR RELIEF ...............................................................................119

iii

Plaintiffs Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Crédit Local, New York Branch, New York Life Insurance Company, New York Life Insurance and Annuity Corporation, The MainStay Funds, MainStay VP Series Fund, Inc., Teachers Insurance and Annuity Association of America, TIAA-CREF Life Insurance Company, TIAA Global Markets, Inc., College Retirement Equities Fund and the TIAA-CREF Funds (collectively, the "Plaintiffs"), by their attorneys Bernstein Litowitz Berger & Grossmann LLP, for their Complaint herein against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home"), Countrywide Home Loans Servicing, LP ("Countrywide Servicing"), Countrywide Securities Corporation ("Countrywide Securities"), Countrywide Capital Markets, LLC ("Countrywide Capital Markets"), CWALT, Inc., CWMBS, Inc., CWABS, Inc., CWHEQ, Inc., Angelo Mozilo, David A. Sambol (collectively, "Countrywide" or the "Countrywide Defendants"), Bank of America Corp., BAC Home Loans Servicing, L.P., NB Holdings Corp. (collectively, the "Bank of America Defendants"), Stanford L. Kurland, David A. Spector, Eric P. Sieracki, N. Joshua Adler, Ranjit Kripalani, Jennifer S. Sandefur, Thomas K. McLaughlin, Thomas H. Boone and Jeffrey P. Grogin (collectively, the "Individual Securities Act Defendants") allege as follows:

## I.     SUMMARY OF THE ACTION

1.     This action concerns a massive fraud perpetrated by Defendant Countrywide Financial and certain of its officers and affiliates against the Plaintiffs, which are investors in mortgage-backed securities ("MBS") issued by Countrywide's subsidiaries. The Plaintiffs are institutional investors that wanted conservative, low-risk investments and thus bought Countrywide MBS (the "Certificates") that were represented to be backed by mortgages issued pursuant to specific underwriting guidelines and rated investment-grade (primarily AAA). In purchasing the Certificates, the Plaintiffs and their investment managers relied on term sheets,

1

prospectuses and other materials prepared by and provided to them by the Defendants, which made representations about the Countrywide Defendants' purportedly conservative mortgage underwriting standards, the appraisals of the mortgaged properties, the mortgages' loan-to-value ("LTV") ratios, and other facts that were material to Plaintiffs' investment decisions. Plaintiffs and their investment managers also relied on Defendants' public statements concerning the Countrywide Defendants' adherence to prudent underwriting guidelines and careful credit analysis. These representations by Defendants were recklessly or knowingly false when made. In reality, Countrywide was an enterprise driven by only one purpose – to originate and securitize as many mortgage loans as possible into MBS to generate profits for the Countrywide Defendants, without regard to the investors that relied on the critical, false information provided to them with respect to the related Certificates.

2.     The scope of the Countrywide Defendants' fraud is reflected by, among other things: (i) a securities fraud action brought by the United States Securities and Exchange Commission ("SEC") against three former senior executives of Countrywide Financial, in which the Court denied those Defendants' motion for summary judgment and which then culminated in an historic settlement (the "SEC Action"); (ii) regulatory actions initiated by multiple state attorneys general which resulted in settlements worth over eight billion dollars; (iii) other fraud actions brought against the Countrywide Defendants by other MBS investors and insurers related to the same wrongdoing alleged herein, along with federal securities fraud claims brought against Countrywide for its misstatements to the investing public regarding the company's mortgage loan underwriting standards; and (iv) the enormous number of defaults and foreclosures in the underlying mortgages supporting the MBS resulting in substantial damages to investors in Countrywide's MBS.

3.      Plaintiffs also separately assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and common law negligent misrepresentation.  These claims are pled separately herein and are based solely on strict liability and negligence.

4.      Plaintiffs purchased between 2005 and 2007 hundreds of millions of dollars in Countrywide MBS in 148 Offerings issued pursuant or traceable to various Registration Statements, Prospectuses and Prospectus Supplements (the "Offering Documents"), all of which contained materially untrue statements and omissions.  Plaintiffs' purchases are set forth in Exhibit 1.

5.      The Offering Documents for the Certificates at issue, which were relied upon by Plaintiffs, represented, among other things, that (i) the loans packaged into the Certificates were underwritten pursuant to the Countrywide Defendants' specific loan origination guidelines; (ii) Countrywide Home (defined below) evaluated the prospective borrowers' credit standing and repayment ability prior to approving any loan; (iii) when the Countrywide Defendants' made an exception to the stated underwriting guidelines, they did so on "a case-by-case basis" and only if "compensating factors" justifying the exception were present; (iv) almost every mortgaged property received an independent appraisal which conformed to acceptable standards and formed the basis of its loan-to-value ("LTV") ratio, an important metric to MBS investors; (v) the loans selected for securitization were chosen "in a manner [not] intended to affect the interests of the certificateholders adversely"; (vi) the "AAA" or other investment-grade ratings assigned to the Certificates were accurate reflections of the Certificates' credit quality; and (vii) the Certificates' issuing trusts possessed good title to the underlying mortgage loans.  Each of these material representations was false when made, and Defendants knew or recklessly

disregarded the falsity of these representations.  Plaintiffs relied on the misrepresentations and suffered losses as a result.

6.     In June 2009, the SEC brought securities fraud and insider trading charges against Countrywide Financial's three most senior executives, Defendants Angelo Mozilo (Countrywide Financial's Chief Executive Officer ("CEO")), David Sambol (Countrywide Financial's Chief Operating Officer ("COO")), and Eric Sieracki (Countrywide Financial's Chief Financial Officer ("CFO")).  The court in the SEC Action held that Mozilo and Sambol "were aware that Countrywide routinely ignored its underwriting guidelines and that Defendants understood the accompanying risks"; that "Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry"; that Countrywide would grant an exception for any loan, no matter what the risk, as long as it could be resold for securitization; and that neither Mozilo nor Sambol believed Countrywide had prudently underwritten its prominent adjustable rate mortgage loans because they knew that borrowers' false stated incomes enormously increased the risk of default on these products.  On October 15, 2010, the SEC announced an historic settlement of the action against the three individuals.  Mozilo agreed to pay a $22.5 million penalty, "the SEC's largest ever financial penalty against a public company's senior executive," and an additional $45 million in disgorgement of ill-gotten gains, for a total of $67.5 million.  Sambol and Sieracki agreed to pay an additional $5.65 million in penalties and disgorgement.

7.     As a result of the SEC Action, numerous internal Countrywide documents have become available that evidence the falsity of the statements in the Certificates' Offering Documents and the Countrywide Defendants' knowledge or recklessness in making these false statements, and are quoted herein.

4

8.      In addition to the SEC Action, numerous State Attorneys General have brought lawsuits or initiated investigations against the Countrywide Defendants based on Countrywide's lending, underwriting, and appraisal practices for mortgage loans.  For example, the California Attorney General has charged that "Countrywide's deceptive scheme had one primary goal – to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums. Over a period of several years, Countrywide constantly expanded its share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market."

9.      Courts in at least two similar actions have already sustained claims of fraudulent and negligent misrepresentations against the Countrywide Defendants for their issuance of MBS.  Last year, the New York Supreme Court sustained fraudulent inducement claims brought by MBIA Insurance Corporation ("MBIA"), a guarantor of Countrywide's MBS, against the Countrywide Defendants based on Countrywide's misrepresentations in ten MBS offering documents.  *MBIA Insurance Corporation v. Countrywide Home Loans, Inc.*, 2009 WL 2135167 (N.Y. Sup. July 8, 2009).  Similarly, on November 29, 2010, a Pennsylvania state court sustained claims brought by the Federal Home Loan Bank of Pittsburgh against Countrywide for fraudulent and negligent misrepresentation based on the purchase of five Countrywide MBS.  *FHLB Pittsburgh v. Countrywide Securities Corporation*, No. GF09-018482 (Court of Common Pleas of Allegheny County, Nov. 29, 2010).

10.     As a result of the Defendants' failure to follow their underwriting standards and guidelines set forth in the Certificates' Offering Documents, delinquencies and defaults in the loan pools underlying the Certificates have skyrocketed.  As of December 2010 over 31% of the mortgage loans underlying the Certificates are over 30 days delinquent, in foreclosure,

bankruptcy, or repossession. This figure does not include the substantial losses suffered by Plaintiffs since the Certificates' issuance due to foreclosures and the removal of those mortgage loans from the current loan pool and current delinquency figures. The underlying loan performance and significant foreclosures have caused Plaintiffs' Certificates to have their credit ratings downgraded. At the time they were issued, 93% of the Certificates were given the highest credit rating – "AAA" – and the remainder was given investment-grade ratings. Today, over 90% of the Certificates' ratings have been slashed to below investment-grade, or junk, and the remainder has largely been downgraded at least one level. Accordingly, the Certificates are no longer marketable at or near the prices Plaintiffs paid for them, and Plaintiffs have suffered significant losses.

11.     Plaintiffs seek compensatory and/or rescissionary damages against Defendants for fraud and negligent misrepresentation and statutory damages under the Securities Act.

## II.     JURISDICTION AND VENUE

12.     Jurisdiction is proper because Plaintiffs' principal places of business are located in New York County. This Court has jurisdiction over each of the non-domiciliary Defendants because each of them transacts business within the State of New York within the meaning of CPLR § 302(a)(1) and each of them committed a tortious act inside the State of New York or outside the State of New York causing injury within the State of New York within the meaning of CPLR §§ 302(a)(2) and 302(a)(3). The amount in controversy exceeds $150,000.

13.     This Court has jurisdiction over the subject matter of the federal Securities Act claims alleged herein pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which provides that "[e]xcept as provided in section 16(c) [15 U.S.C. § 77p(c)] no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court

of the United States." This action is not removable under Sections 16(c) and 22 of the Securities Act.

14.    Venue is proper in this Court because Plaintiffs and some Defendants maintain their principal places of business in New York County.

## III.    THE COMMON LAW FRAUD PARTIES

### A.    Plaintiffs

15.    Dexia Holdings, Inc. ("DHI"), is a Delaware corporation with its principal place of business in New York, New York.  FSA Asset Management LLC ("FSAM") is a Delaware limited liability company and has its principal place of business in New York, New York. FSAM is an indirect, wholly owned subsidiary of DHI.  FSAM acquired Countrywide Certificates pursuant or traceable to the Offering Documents.  A complete list of FSAM's purchases is set forth in the accompanying Exhibit 1.  FSAM and DHI are both affiliates of Dexia Crédit Local, New York Branch ("DCLNY"), a French banking institution having a branch in New York which is licensed by the New York State Banking Department.  DHI and DCLNY have economic interests in the Certificates purchased and held by FSAM in accordance with intercompany agreements among these plaintiffs.  DHI, FSAM and DCLNY are collectively referred to as the "Dexia Plaintiffs."

16.    New York Life Insurance Company ("NYL") is a New York mutual life insurance company with its principal place of business in New York, New York.  New York Life Insurance and Annuity Corporation ("NYLIAC") is a Delaware corporation with its principal place of business in New York, New York.  NYL and NYLIAC acquired Countrywide Certificates pursuant to or traceable to the Offering Documents on their own behalf or through accounts maintained within and on behalf of NYL and NYLIAC.  The MainStay Funds is a Massachusetts business trust with its principal place of business in New York, New York.  The

MainStay Income Builder Fund (f/k/a MainStay Income Manager Fund, which was f/k/a MainStay Asset Manager Fund) ("CFI"), a series of the MainStay Funds, acquired Countrywide Certificates. The MainStay VP Series Fund, Inc. ("QAM"), a series of MainStay VP Series Fund, Inc., acquired Countrywide Certificates. CFI and QAM are both mutual funds with principal place of business in New York, New York. The above-identified Plaintiffs NYL, NYLIAC, QAM and CFI are collectively referred to as the "New York Life Plaintiffs." The New York Life Plaintiffs acquired Countrywide Certificates pursuant or traceable to the Offering Documents. A complete list of the New York Life Plaintiffs' purchases is set forth in the accompanying Exhibit 1. All of the investment decisions related to the New York Life Plaintiffs' acquisition of Countrywide Certificates were made by the New York Life Plaintiffs' investment manager, non-party New York Life Investment Management LLC.

17.   Teachers Insurance and Annuity Association of America ("TIAA") is a New York corporation with its principal place of business in New York, New York. TIAA's purpose is to provide annuities, life and other insurance, and pension plan counseling to the employees of nonprofit colleges, universities, institutions engaged primarily in education and research and other nonprofit institutions. TIAA-CREF Life Insurance Company ("TIAA-CREF LIC") is a New York corporation with its principal place of business in New York, New York. TIAA Global Markets, Inc. ("TGM") is a Delaware corporation with its principal place of business in New York, New York.   TGM is a wholly-owned subsidiary of TIAA. All of the investment decisions related to the acquisition of Countrywide Certificates by Plaintiffs TIAA, TIAA-CREF LIC and TGM were made by internal investment personnel. College Retirement Equities Fund ("CREF") is a nonprofit corporation created through an act of the New York state legislature in 1952, and is also a registered investment company under the Investment Company Act of 1940. CREF's purchases of Countrywide Certificates were made through two CREF

accounts: the "Bond Market Account" and the "Social Choice Account." All of the investment decisions related to CREF's acquisition of Countrywide Certificates were made by non-party TIAA-CREF Investment Management, LLC, a Delaware limited liability company. The TIAA-CREF Funds is a Delaware statutory trust which purchased Countrywide Certificates through three different fund series: the "Bond Fund," the "Bond Plus Fund" and the "Short Term Bond Fund." All of the investment decisions related to the TIAA-CREF Funds' acquisition of Countrywide Certificates were made by non-party Teachers Advisors, Inc., a Delaware corporation and registered investment adviser. TIAA, TIAA-CREF LIC, TGM, CREF, and the TIAA-CREF Funds are collectively referred to as the "TIAA-CREF Plaintiffs." The TIAA-CREF Plaintiffs acquired Countrywide Certificates pursuant or traceable to the Offering Documents. A complete list of the TIAA-CREF Plaintiffs' purchases is set forth in the accompanying Exhibit 1.

### B. Countrywide Defendants

18.     Defendant Countrywide Financial Corporation ("Countrywide Financial" or the "Company") was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States. As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

19.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home originates and services residential home mortgage loans. Countrywide Home served as the "Seller" of the mortgage

loans comprising the security for each of the Certificates purchased by Plaintiffs, meaning that it played a central role in providing the pools of mortgage loans upon which the Certificates were based to the issuing trusts. Countrywide Home was acquired by Bank of America on July 1, 2008, and is now doing business as Bank of America Home Loans, a division of Bank of America.

20.    Defendant Countrywide Home Loans Servicing LP ("Countrywide Servicing"), a wholly owned subsidiary of Countrywide Capital Markets which is in turn a wholly-owned subsidiary of Countrywide Financial, is a limited partnership organized under the laws of Texas with offices in Plano, Texas and Calabasas, California. Countrywide Servicing services residential home mortgage loans. Countrywide Servicing was acquired by Bank of America on July 1, 2008, and is now doing business as BAC Home Loan Servicing, LP.  Countrywide Servicing was the Servicer of every Certificate purchased by Plaintiffs.

21.    Defendant Countrywide Securities Corporation ("Countrywide Securities"), a wholly owned subsidiary of Countrywide Financial, is a California corporation with its principal place of business in Calabasas, California.  During times relevant to this Complaint, Countrywide Securities had an office in New York, New York.  Countrywide Securities is a registered broker-dealer and was an underwriter of the offerings of MBS.  Countrywide Securities was acquired by Bank of America on July 1, 2008.

22.    Defendant Countrywide Capital Markets, LLC ("Countrywide Capital Markets"), a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Capital Markets (now a subsidiary of Bank of America) operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities and Countrywide Servicing Exchange.

10

23.     Defendant CWALT, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWALT served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWALT acted as Depositor for the Registration Statements and Certificates identified in Exhibit 1.

24.     Defendant CWABS, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWABS's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWABS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWABS acted as Depositor for the Registration Statements and Certificates identified in Exhibit 1.

25.     Defendant CWMBS, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWMBS's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWMBS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWMBS acted as Depositor for the Registration Statements and Certificates identified in Exhibit 1.

26.     Defendant CWHEQ, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWHEQ's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWHEQ served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWHEQ acted as Depositor for the Registration Statements and Certificates identified in Exhibit 1.

27.     Defendants CWALT, CWMBS, CWABS, and CWHEQ are collectively referred to herein as the "Depositor Defendants." The Depositor Defendants were controlled directly by Countrywide Financial, including by the appointment of Countrywide Financial executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to Countrywide and consolidated into Countrywide Financial's financial statements. Defendant Countrywide Financial, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.

28.     Each time the Depositor Defendants publicly offered and sold MBS, they filed publicly-available prospectus supplements with the SEC. Between 2005 and 2007, Countrywide's four Depositor Defendants issued 447 prospectus supplements. Plaintiffs purchased Certificates issued pursuant to 148 of those prospectus supplements.

29.     Defendant Angelo R. Mozilo ("Mozilo"), Countrywide's co-founder, was Chairman of Countrywide's Board of Directors starting in March 1999 and Chief Executive Officer ("CEO") starting in February 1998. He was also President of Countrywide Financial from March 2000 through December 2003. Mozilo was a member of Countrywide Financial's Board beginning in 1969, when the Company was founded, and served in other executive roles since then. He left Countrywide on July 1, 2008. In October 2010, Mozilo settled securities fraud claims brought against him by the SEC for $67.5 million in penalties and forfeiture of ill-gotten gains, the largest penalty ever paid by a senior corporate executive in an SEC settlement. At all relevant times, Mozilo directed, authorized, and participated in the Countrywide Defendants' wrongdoing, as alleged herein.

30.     Defendant David Sambol ("Sambol") joined Countrywide Financial in 1985 and was Countrywide Financial's President and Chief Operating Officer ("COO") from September

12

2006 until Countrywide Financial was acquired by Bank of America in 2008. Sambol was Countrywide Financial's executive managing director for business segment operations and Chief Production Officer from April 2006 until September 2006, and executive managing director and chief of mortgage banking and capital markets from January 2004 until April 2006. Sambol was also Chairman, CEO and a member of the Board of Directors of Countrywide Home beginning in 2007. In October 2010, Sambol settled securities fraud claims brought against him by the SEC. At all relevant times, Sambol directed, authorized, and participated in the Countrywide Defendants' wrongdoing, as alleged herein.

31.     The Defendants identified in ¶¶ 18-30 are hereinafter collectively referred to as the "Countrywide Defendants."

### C.     Bank Of America Defendants

32.     Defendant Bank of America Corp. ("Bank of America") is a successor to Defendant Countrywide, as described in ¶¶ 205-211. On July 1, 2008, Countrywide Financial Corporation completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial. The acquisition was an all-stock transaction. Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide. At the time of Bank of America's purchase of Countrywide, a Bank of America spokesperson publicly stated: "We bought the company and all of its assets and liabilities . . . . We are aware of the claims and potential claims against the company and have factored these into the purchase." Bank of America is a successor-in-interest

13

to the Countrywide Defendants and is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein.[1]

33.     Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, CA. BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.

34.     Defendant NB Holdings Corporation is a Delaware corporation.  NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home Loans.  On July 3, 2008, Defendant Countrywide Home completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

35.     The Defendants identified in ¶¶ 32-34 are hereinafter collectively referred to as the "Bank of America Defendants."

## IV.     FACTS RELEVANT TO PLAINTIFFS' COMMON LAW FRAUD CLAIMS

### A.     Countrywide Misrepresents Its Mortgage Loan Underwriting Guidelines

36.     Countrywide was co-founded in 1969 by Mozilo and grew to become the largest mortgage lender in the United States by 2005. Countrywide originated, sold, and serviced both prime and subprime (which Countrywide's periodic filings referred to as "nonprime") mortgage

---

[1] The federal court in the SEC Action against Mozilo and Sambol recently noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009." *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

loans. According to its 2005 10-K, 90% of Countrywide's loans were "prime," which, Countrywide stated, meant that these loans were "prime credit quality first-lien mortgage loans secured by single-family residences."

37.      Prior to 2005, a substantial majority of the mortgage loans that Countrywide originated each year were traditional long-term, fixed-rate, first-lien and fully documented mortgage loans to prime borrowers. These so-called "conforming loan" mortgages met the guidelines for sale to the government-sponsored enterprises ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and were traditionally limited to mortgage loans no greater than $417,000 for a single family residence. Conforming loans, if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry, with the lowest rates of delinquency and default. During the period 2001-2003, more than 50% of Countrywide's loans were conforming loans. During 2001-2003, Countrywide originated $124 billion, $252 billion, and $435 billion in loans, respectively.

38.      Mortgage loans that do not meet the GSEs' guidelines are known in the industry as "non-conforming loans." Countrywide's proportion of nonconforming loans significantly increased in 2005. As discussed in detail below, however, Countrywide continued to represent that it complied with strict underwriting guidelines even while it underwrote increasing amounts of non-conforming loans. In July 2003, during a conference call with analysts, Mozilo announced that Countrywide's new goal was "to dominate the purchase market and to get [Countrywide's] overall market share to the ultimate thirty percent by 2006-2007." Starting no later than 2004, Countrywide began offering a broader array of products in an attempt to effectuate this goal and retain its title as top mortgage lender. Countrywide Home originated over $499 billion in mortgage loans in 2005, $468 billion in 2006, and $416 billion in 2007.

15

Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively.

39.    As shown on Table 1, below, in terms of product mix, in 2005, only 32% of Countrywide's loan originations were prime conforming loans, down from over 50% during earlier periods. At the same time, the percentage of non-conforming loans, including prime, subprime and home equity, had increased to over 50% of total loan originations. By 2006, its mix of business had changed even more, with only 31.9% of the dollar value of its originations conforming conventional loans, 45.2% nonconforming conventional loans, 8.7% subprime, and 10.2% home equity.

**Table 1**
**Countrywide Loan Production**
**Share of Dollar Value of Loans by Loan Type (2001-2007)[2]**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| **Traditional Loans** | | | | | | | |
| Prime Conforming Loans | 61.7 | 59.2 | 53.9 | 37.1 | 32.0 | 31.9 | 52.1 |
| FHA/VA Loans | 11.4 | 7.6 | 5.6 | 3.6 | 2.1 | 2.8 | 5.4 |
| **Traditional Sub-Total** | **73.0** | **66.8** | **59.5** | **40.7** | **34.1** | **34.6** | **57.6** |
| **Nontraditional Loans** | | | | | | | |
| Prime Nonconforming Loans | 17.9 | 24.9 | 31.7 | 39.8 | 47.2 | 45.2 | 28.3 |
| Prime Home Equity Loans | 4.5 | 3.7 | 4.2 | 8.5 | 9.0 | 10.2 | 8.3 |
| Nonprime Mortgage Loans | 4.5 | 4.6 | 4.6 | 10.9 | 8.9 | 8.7 | 4.1 |
| Commercial Real Estate Loans | 0.0 | 0.0 | 0.0 | 0.1 | 0.8 | 1.2 | 1.8 |

---

[2] Countrywide 10-K reports: 2007, page 29; 2006 page 28; and 2005, page 24.  All figures are shown as % of total value of Countrywide loan production.

| Nontraditional Sub-Total | 27.0 | 33.2 | 40.5 | 59.3 | 65.9 | 65.4 | 42.4 |
|---|---|---|---|---|---|---|---|
| TOTAL | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

40.     Despite taking on new risks to participate in the non-GSE mortgage-backed securities market, Countrywide continued to extol its underwriting standards, conveying to Plaintiffs and other interested parties that it was a successful, trustworthy company characterized by high professional standards. Countrywide's Annual Reports for 2005, 2006, and 2007 stated that the company "establishe[d] standards for the determination of acceptable credit risks" and that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." The Annual Reports also promoted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help prevent fraud." In its 2005 10-K, for example, which was filed in March 2006, Countrywide stated that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . . We are focused on ensuring the quality of our mortgage loan production . . . ."

41.     Countrywide claimed that its disciplined underwriting standards not only distinguished it from other lenders in the industry, but reflected enviable best practices. For example, in a Fixed Income Investor Forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending: "[A]s an industry leader we served as a role model to others in terms of responsible lending. We take seriously the role of a responsible lender for all of our constituencies . . . . *To help protect our bond holder customers, we engage in prudent underwriting guidelines.*"[3]   At the same forum, Sambol stated that:

---

[3] Emphasis in quotations is added throughout this Complaint, except as otherwise noted.

We're extremely competitive in terms of our desire to win, and we have a particular focus on offense, which at the same time is supplemented by a strong defense as well, meaning that we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance . . . . *[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do.*

42.     Countrywide represented to Plaintiffs that these prudent underwriting guidelines were used in originating the loans packaged into the Certificates.  According to the Prospectus Supplements for each Certificate purchased by Plaintiffs, Countrywide's high quality underwriting standards were applied to the underlying loans originated by Countrywide for each Offering, because "all" or some portion of the mortgage loans "will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards."  As explained herein, these representations were false and misleading and omitted material facts because they directly contradicted the reality that Countrywide was knowingly originating an increasing number of poor-quality loans that did not comply with its stated underwriting guidelines, without the safeguards and standards that Countrywide described.  Plaintiffs relied upon Countrywide's representation that it applied its "prudent underwriting guidelines" to the loans packaged into the Certificates, and were induced to purchase the Certificates by these and the Countrywide Defendants' other statements, to their enormous financial detriment.

**B.     The Securitization Process**

43.     The vast majority of the loans underwritten and originated by Countrywide were resold to investors in the secondary market, through either whole loan sales or MBS securitizations.  Despite Countrywide's statement that it "ensure[d] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages," and unbeknownst to

18

Plaintiffs, it became increasingly difficult for Countrywide to meet the market demand for MBS using its stated underwriting guidelines. In order to originate more loans, Countrywide created and approved riskier loan products not only by implementing looser stated underwriting guidelines, but by applying numerous exceptions to its already weakened standards.

44.     Mortgage loan securitizations were vital to Countrywide's financial success. Unlike major banking institutions that could hold significant assets on their balance sheets long term, Countrywide needed to engage in mortgage loan securitizations so that it could remove the mortgage loan assets and potential liabilities from its balance sheet. Not only did Countrywide's securitizations and whole loan sales generate well over $1 billion in pre-tax earnings, but the sale of these loans transferred the risk of the borrowers' default from Countrywide's balance sheet to investors, including Plaintiffs.

45.     Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets. Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans. Although the structure and underlying collateral of each offering varies, the basic principle remains the same: When borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to investors. Accordingly, the value of an MBS depends primarily on the underlying mortgage borrowers' ability to make principal and interest payments and, secondarily, on the adequacy of the collateral in the event of default. If the loans underlying a Certificate suffer defaults and delinquencies in excess of the assumptions built into the payment structure, or the underlying properties cannot be sold at sufficient value following default, investors suffer greater than expected losses.

46.     The first step in creating each of the Certificates was the acquisition by one of the four Depositor Defendants of an inventory of loans from the seller, Defendant Countrywide

Home Loans, which either originated all of the underlying loans or combined loans it originated with loans acquired from other mortgage originators, in exchange for cash. The Depositor Defendants then transferred, or deposited, the acquired pool of loans to an "issuing trust."

47.     The Depositor Defendants securitized the pool of loans in the issuing trust so that the rights to the cash flows from the loans could be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches consist of multiple series of related MBS offered as part of the same offering, each with a different level of risk and reward, including different levels of credit enhancement. One form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loans in the pool for a securitization (and therefore presumably the total value of the underlying properties) exceeds the aggregate amount of Securities issued and sold in the securitization. Another example of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be greater than the interest distributable on the Securities and fees and expenses payable by the trust for that period; excess interest may be applied both to absorb any interest shortfalls and to pay principal on the Securities to the extent needed to maintain the required level of overcollateralization. Both of these credit enhancements serve to protect the investor against loss to varying degrees. Any losses on the underlying loans – whether due to default, delinquency, or otherwise – are generally applied in reverse order of seniority.

48.     Because these tranches have different claims on the cash flow generated by the pool of mortgages, credit rating agencies assign different ratings to them and issuers can price them differently. The most senior tranches of the Certificates received "AAA" credit ratings or their equivalent from the three leading rating agencies, which indicated the lowest risk and

highest quality.  Junior tranches – which were not purchased by Plaintiffs – usually obtained lower ratings and were less insulated from risk, but offered greater potential returns.[4]  For example, a pool of loans with an overall weighted-average coupon of 7% might be divided into multiple tranches where the lower-risk, higher-quality senior certificates are expected to yield less than 7% and are rated investment grade ("AAA," "AA," "A" or "BBB"), while the higher-risk, lower-quality subordinate certificates bear coupons that are higher than 7%.  Only if credit losses exceed the amount of the subordinate tranche balances will the senior certificate tranches face credit losses, as the subordinate tranches will absorb initial losses.

49.    The credit rating agencies received the information about the mortgage loan pools for each securitization and about the structure of the securitization from the sponsor, *i.e.*, Countrywide Home.  Countrywide worked closely with the rating agencies to structure the securitizations to ensure that each tranche of MBS received the desired rating.  Countrywide knew or recklessly disregarded that the information it provided to the rating agencies materially misrepresented and omitted the true facts about the credit quality of the mortgage pools and that the ratings therefore did not accurately reflect the credit risk of the MBS.

50.    Plaintiffs purchased only investment-grade tranches of the Certificates, with over 90% of the Certificates rated AAA at the time of purchase.  A purchaser of AAA-rated residential MBS should have virtually no risk of incurring loss, while a purchaser of other investment-grade Certificates should have only a minimal risk of loss.

--------------------

[4] Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA."  Fitch's highest rating is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" are also investment-grade and represent high credit quality, upper-medium credit quality, and medium credit quality, respectively.  Any instrument rated lower than BBB is considered below investment-grade.  All of the Certificates purchased by Plaintiffs were investment grade and most were AAA.

51.     Credit ratings are intended to be comparable across different types of fixed income instruments.  In 1994, a Moody's executive stated that "no matter what types of instruments the ratings apply to, no matter where the issuer resides, and no matter what currency or market in which the security is issued, Moody's ratings are intended to have the same relative meanings in terms of expected credit loss."  Similarly, in a May 29, 2007 publication, S&P stated:  "Our ratings represent a uniform measure of credit quality globally and across all types of debt instruments.  In other words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an 'AAA' rated securitized issue."

52.     Once the tranches were established, the issuing trusts passed the securities back to the Depositor Defendants, who became the issuers of the Certificates.  The Depositor Defendants then passed the Certificates to Countrywide Securities and one or more other underwriters, who in turn offered the Certificates to Plaintiffs and other investors in exchange for cash that was then passed back to the Depositor Defendants, minus any fees owed to the underwriters.  Following the sale of the Certificates, Countrywide Home Loan Servicing LP was responsible for the collection of borrower payments, and the trustee participates in the subsequent distribution of those payments to investors at regular intervals in accordance with the offering's structure.

53.     In contrast, in the traditional mortgage model, a mortgage originator originated loans to borrowers, held the loans to maturity, and therefore retained the credit default risk.  As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

54.     Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages.  When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payment of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of the collateral was not sufficient to repay the loan.  As a result of this "originate to hold" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

55.     With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to distribute" model, in which mortgage originators sold the mortgages and transferred credit risk to investors through the issuance and sale of MBS.  Securitization concurrently provided lenders like Countrywide with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality. However, the contractual terms of the securitization transactions and adherence to good business practices obligate mortgage originators to underwrite loans in accordance with their stated underwriting and origination policies and to obtain accurate appraisals of the mortgaged properties.

56.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits.  During that period, Countrywide made loans in accordance with its stated underwriting and appraisal standards.  In the early 2000s, however, Countrywide began to systematically disregard its stated underwriting standards in an effort to originate an unprecedented number of loans for securitization.

C.    **Countrywide Abandoned Its Underwriting Guidelines By Approving Extremely Risky Loans Through "Shadow Guidelines" And Other Undisclosed Exceptions**

57.    Defendants made affirmative representations in the Offering Documents about Countrywide's underwriting guidelines, all of which were intended to induce Plaintiffs and other investors to invest in the Certificates. For example, Countrywide represented in many of the Certificate Offering Documents that that all or a portion of the underlying loans were "originated or acquired in accordance with Countrywide's underwriting standards," noting only that "exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."    Countrywide also represented generally that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Countrywide also made representations and warranties that the selection of the underlying loans "was not made in a manner intended to affect the interests of the certificateholders adversely." Plaintiffs relied on these representations about Countrywide's mortgage underwriting guidelines, which were critical to Plaintiffs' decisions to purchase the Certificates.

58.    Because its loan-origination guidelines were ostensibly designed to ensure that loans would perform over time, Countrywide knew that the rigorousness of its guidelines—and its adherence to those guidelines—would materially affect the risk of investing in the Certificates.  Throughout Countrywide's expansion, Defendant Mozilo consistently represented that Countrywide would not sacrifice its strict and disciplined underwriting standards. In a January 2004 call with analysts, Mozilo pledged that Countrywide's goal of achieving 30% market share would not compromise the Company's strict underwriting standards, stating that Countrywide would target the safest borrowers in the market in order to maintain its

24

commitment to quality. *"Going for 30% mortgage share here is totally unrelated to quality of loans we go after.... There will be no compromise in that as we grow market share. Nor is there a necessity to do that."*

59.     Countrywide reassured investors that the Company's underwriting procedures and credit risk management remained highly rigorous in the following years.  For example, in its 2005 10-K, filed with the SEC on February 28, 2006, and thereafter, Countrywide represented that:

> *[Countrywide] ensure[s] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards . . . .* [W]e have a major focus on ensuring the quality of our mortgage loan production and we make significant investments in personnel and technology in this regard.

60.     During a March 15, 2005 conference call with analysts, Mozilo responded to a question about Countrywide's strategy dating back to 2003, for increasing market share by assuring Countrywide's constituents:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . . Is it achievable? Absolutely . . . . But I will say this to you, that *under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.*

61.     Other senior Countrywide officers reiterated that the Company had not strayed from its underwriting standards, and would not do so in the future. For example, in an April 2005 conference call with analysts, Defendant Sieracki, Countrywide's CFO, responded to a question about whether Countrywide had changed its underwriting protocols: "I think [Fair Isaac Corporation ("FICO") credit scores, combined loan-to-value ratios, and debt-to-income ratios] will remain . . . consistent with the first quarter and most of what we did in 2004. We don't see any change in our protocol relative to the volume [of] loans that we're originating."

62.     As explained herein, at the time the Certificates were offered between 2005 through 2007, Countrywide knew that its statements regarding its underwriting guidelines and credit risk management processes were false, and that it had no intention of abiding by its representations and warranties to investors. Under the direction of Mozilo and Sambol, Countrywide adopted a new corporate culture of writing as many mortgage loans as possible—and at the highest interest rates and fees possible—regardless of the creditworthiness or evident fraud of the borrower. Once Mozilo and Sambol had determined that profit growth through securitization required accelerating loan origination, Countrywide motivated its loan officers and external brokers to drive up loan volume regardless of material deviations from stated underwriting guidelines.

63.     As stated above, documents produced in the SEC Action – including internal emails, committee notes, memos and deposition testimony – were disclosed to the public during the litigation of the individual Defendants' unsuccessful motion for summary judgment in that action. These materials provide detailed evidence of Countrywide's complete abandonment of its stated underwriting standards through its rampant use of "exceptions" to those guidelines. Between 2005 and 2007, Defendants falsely reassured Plaintiffs and other MBS investors that Countrywide was primarily an originator and seller of high-quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices.  In fact, however, Countrywide's deteriorating underwriting practices enabled loan applications that reflected borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets and income), title defects, excessive debt to income ratios, inadequate FICO scores, and other material violations of guidelines. These violations made Countrywide's related representations regarding its adherence to stated underwriting guidelines materially false and misleading because, in reality, Countrywide undertook an undisclosed and unprecedented

loosening of its underwriting guidelines such that the exceptions became the standard without compensating factors.

64.    Although Countrywide disclosed that the underlying loan pool for each Certificate could contain loans originated pursuant to "exceptions" to the Company's stated underwriting guidelines if "compensating factors" existed, Countrywide nowhere disclosed what percentage of (or in many cases, whether any) securitized loans were actually approved pursuant to exceptions, nor did it define anywhere the types of exceptions that Countrywide employed generally in the loan pool, or specifically for each loan.   In fact, as confirmed by several senior executives at Countrywide, including executives directly involved in loan securitizations, Countrywide never disclosed in any of the relevant Offering Documents or in any other public filings the amount of loans it was underwriting on an exceptions basis for any loan product or division.  Paul Liu, an attorney who worked for Countrywide and participated in the preparation of the Offering Documents, testified in the SEC Action that the Prospectus Supplements did not disclose the number or percentage of loans included in each securitization that were underwritten pursuant to exceptions, or even in many cases whether any loans within that securitization were underwritten pursuant to exceptions – just that exceptions "may be made."

65.    According to Countrywide's Chief Risk Officer, John McMurray, Countrywide's level of exceptions was higher than other mortgage lenders.  At a June 28, 2005 Credit Risk Committee meeting, senior executives including CFO Sieracki and McMurray received a presentation informing the attendees that nonconforming exceptions loans accounted for a staggering 40% of Countrywide's loan originations.  By June 2006, a Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, and 55.3% of its

27

standalone home equity loans.  Despite this high level of exceptions, Countrywide assured investors that the level of exceptions was low.  According to Christopher Brendler, an analyst for Stifel Nicholas who covered Countrywide beginning in January 2006 and was deposed in the SEC Action, Countrywide repeatedly told investors during conference calls and at investor forums that the company's policy was to "keep our exceptions low."  Brendler also testified that a low exception rate for the industry would have been 5% to 10% of total loans, and most certainly not upwards of 25% to 55%, such as Countrywide actually had.

66.     Subsequent press reports and articles highlight the excessive focus on lending volume and failure to follow stated underwriting standards that existed throughout Countrywide during the time the Depositor Defendants were issuing Certificates with underlying Countrywide loans.  For example, In February 2009, in an article entitled "25 People to Blame for the Financial Crisis," *Time* magazine described how Mozilo's and Countrywide's focus on loan volume and the practice of offering mortgages to "practically any adult" ignored a borrower's "questionable ability to repay" those mortgage loans.  Thus, Countrywide steered borrowers to loans with higher interest rates and the most fees, resulting in greater delinquencies.

67.     Lawsuits filed by insurers of some of Countrywide's mortgage loans have confirmed Countrywide's deviation from its stated underwriting practices, and material deficiencies prevalent in the loans underwritten pursuant to these deviations.  On September 30, 2008, MBIA filed a complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825.  The MBIA complaint alleges that Countrywide fraudulently induced MBIA to provide insurance for certain Certificates.  Through an investigation of approximately 19,000 loan files, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines

28

Countrywide represented it would follow." MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)." Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." The court sustained MBIA's common law fraud claims against Countrywide. *See MBIA Insurance Corporation v. Countrywide Home Loans, Inc.*, 2009 WL 2135167 (N.Y. Sup. July 8, 2009). Other complaints filed by bond insurers Ambac Assurance Corporation (*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, Index No. 641612/2010 (filed in the Supreme Court of the State of New York on May 6, 2010), Syncora Guarantee Incorporated (*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, Index No. 650042/09E (Amended Complaint filed in the Supreme Court of the State of New York on May 6, 2010 after the initial Complaint was largely sustained on March 31, 2010); and Mortgage Guaranty Insurance Corporation (arbitration) also reveal shocking fraud by Countrywide loan officers.

68.    Two of Countrywide's widely used exceptions to its represented underwriting guidelines were the focus of the SEC Action, and exemplify the extreme undisclosed risks posed by such practices. From the beginning of 2005, it was Countrywide's policy to "match" any product offered by any of its competitors, regardless of risk, making its composite "matching" guidelines, internally referred to as "shadow guidelines," the "most aggressive in the industry." Another of Countrywide's "exceptions" to its stated underwriting guidelines destroyed any remaining safeguards with respect to loans slated to be resold and securitized. Knowing that it could unload the risk of borrower default by selling and securitizing the riskiest

loans, Countrywide instituted a policy to accept *any loan – regardless of the risk level or likelihood of default* – as long as the loan could be resold for securitization, a policy that directly and adversely affected the interests of Plaintiffs and other investors in the Certificates.

      1.     **Countrywide's "Matching" Strategy Ensured That Countrywide's Underwriting Guidelines Were The "Most Aggressive" Guidelines In The Market**

69.     One of the most egregious examples of Countrywide's use of exceptions was institutionalized in the Company's "matching strategy."

70.     When processing loan applications, Countrywide first applied its standard underwriting guidelines to all applications using an automated underwriting system known as "CLUES" (Countrywide Loan Underwriting Expert System).  To the public and the participants in the securitizations, including Plaintiffs, Countrywide extolled the integrity and consistency of its automated CLUES system.  Countrywide claimed that it made exceptions to CLUES only when specific and strong compensating factors were present, but this was false.  In fact there were three levels of exceptions, with a threshold for risk that surpassed that of any of Countrywide's competitors.

71.     First, if CLUES found problems with an application because it failed to meet one of the standard criteria, the application was sent to a loan officer for further consideration or manual underwriting in the "Exception Processing System" "because it busted one or more of the program guidelines or because of these red flags," according to Chief Risk Officer McMurray.  If the loan officer could not rectify the problems and approve the loan in accordance with Countrywide's stated underwriting guidelines or some limited exceptions, the loan officer did not reject the application.  Rather, he or she would request an "exception" from the guidelines from more senior underwriters at Countrywide's loan production structured lending desks ("Production SLD"), otherwise known as "the exception desk."

72.     The Production SLD, the second level of exception review, granted exceptions, in large part, pursuant to Countrywide's "matching strategy." From at least the beginning of 2005, Countrywide implemented a program which allowed loan officers to "match" the most aggressive product or policy of any loan origination competitor, including purely subprime lenders such as New Century and First Franklin, even if that product or policy violated Countrywide's stated underwriting guidelines. Countrywide's liberal use of any competitor's "composite guideline" made the Company's loan origination practices "the most aggressive in the industry" according to Countrywide's own Chief Risk Officer, John McMurray. Countrywide's matching strategy was not limited to one single loan product, or limited to subprime loans.

73.     In 2005, 2006 and 2007, McMurray repeatedly expressed his concern over the potential impact of the "matching strategy," warning Defendant Sambol in a June 14, 2005 email that: "As a consequence of CW's strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas. While I'm sure you already know this, I think we should be very deliberate since the outer boundaries are potentially controversial and have high expected default rates and losses."

74.     Ten days later, on June 24, 2005, McMurray sent another email to Defendant Sambol, expressing his strong reservations regarding Countrywide's practice of matching the "outer boundaries" of any competitor's most aggressive mortgage loan offerings, a practice which he noted was a "critical component of [Countrywide's] corporate strategy." McMurray explained that, because Countrywide mixed and matched the most aggressive guidelines from various lenders in the industry, Countrywide's "composite guides are likely among the *most aggressive* in the industry." McMurray later testified in the SEC Action that the matching

31

strategy at Countrywide was a "corporate principle and practice that had a profound effect on credit policy" at Countrywide.

75.     McMurray explained why Countrywide's "matching strategy" ensured that Countrywide was the most aggressive originator in the market: "And so, . . . if you match one lender on – on one – on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that – of that two-step match would be more – would be *more aggressive* than either one of those competitor reference points viewed in isolation."  McMurray repeatedly explained his view and the risks of the "matching strategy" to others within Countrywide, including Defendant Sambol, but these concerns were ignored.

76.     After being ignored for over one and a half years, McMurray restated his concerns in a November 2, 2006 email that was forwarded to Defendant Sambol, in which McMurray explained that when the composite matching strategy "is done across multiple lenders, across products and across guidelines, the composite set of guidelines will be the most aggressive credit in the market." He continued: "With this approach, our credit policy is ceded, on both a product-by-product as well as item-by-item basis, to the most aggressive lenders in the market. Do we want to effectively cede our policy and is this approach 'saleable' for a risk perspective to those constituents who may worry about our risk profile?"  Again, Sambol ignored these concerns and Countrywide continued to employ this strategy.

77.     Countrywide never disclosed to Plaintiffs or other investors that it had a matching strategy that caused the Company to cede its credit policy to the most aggressive lenders in the market. Executives knew – and kept it a secret – that the quality of loans originated by Countrywide was deteriorating, and would continue to worsen.   Indeed, a February 11, 2007 email from McMurray to Sambol confirms that this strategy was not

disclosed to anyone outside Countrywide when he wrote that he doubted Countrywide's composite matching strategy "would play well with regulators, investors, rating agencies, etc. *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines.*" Information that Countrywide was actually the most aggressive lender in the industry would have been extremely material to Plaintiffs and other investors. As Stifel Nicholas analyst Brendler testified in the SEC Action, disclosure of the "matching strategy" "would have been a very disturbing disclosure" because "to know that [Countrywide was] basically seeking out the most aggressive policies and underwriting guidelines of [its] competitors without consideration for other factors" meant that Countrywide was "essentially creating a worst of the worst."

       **2.     Countrywide's Secondary Markets Structured Loan Desk Abandoned All Underwriting Standards, Approving Any Loan, Regardless Of Its Credit Risk, As Long As The Loan Could Be Resold And Securitized**

     78.   In an effort to maximize its ability to create more MBS, Countrywide implemented a third, even riskier tier of exceptions in early 2005 through which *any* loan application would be approved as long as it met a single criterion: Could the loan be completely resold in the secondary markets such that Countrywide could transfer all of the risk? If the answer was yes, the loan would be approved, regardless of the fact that it did not meet Countrywide's underwriting guidelines or the most aggressive of any competitor's guidelines.

     79.   When a loan application was rejected using both the "shadow" exceptions guidelines applied by the Production SLD, the application was sent to the Secondary Markets SLD, a desk set up specifically to approve last-ditch exceptions. Defendant Sambol summarized the theory behind the Secondary Markets SLD in a February 13, 2005 email explaining that Countrywide "*should be willing to price virtually any loan that we reasonably*

*believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal.*" In contrast to his public statements, as far back as September 2004, Defendant Mozilo circulated an email expressing concern over the "clear deterioration in the credit quality of loans being originated over the past several years" and his opinion that "the trend is getting worse." In reaction to the worsening trend, he stated that Countrywide should "*seriously consider securitizing and selling a substantial portion of our current and future subprime residuals.*"

80.     Before July 2005, the Secondary Markets SLD approved any loan which it believed could be resold and securitized, as long as that loan was a 30-year fixed rate mortgage or an 80/20 adjustable rate mortgage ("ARM").[5] This changed in the summer of 2005. In a July 28, 2005 email sent by David Spector, Vice President and a board member of each Depositor Defendant, to Countrywide's Managing Directors and Secondary Markets senior executives, including Joshua Adler, another Depositor Defendant board member, Spector stated that, as a result of "increased demand from Production for exceptions on all products in general and on Pay Option loans in particular," he wanted to update them on "the changes we will be implementing going forward":

> As indicated in a previous note, when we first started the SLD, the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides. The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs. In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs. *While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and Pay Option loans in particular.* In addition, Production has been expressing frustration that we were only offering major

---

[5] 80/20 ARMs, are also referred to as "piggyback" mortgages because two loans are taken out simultaneously for the same home, one for 80% of the mortgage and the other for the remaining 20% of the mortgage, the latter being sold at a higher interest rate because the buyer is putting out none of his own cash.

exceptions for 5/1 ARMs and 30-year fixed rates. *As such, to the widest extent possible, we are going to start allowing exceptions on all requests, regardless of loan programs, for loans less than $3 million effective immediately.*

The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. *We will assume securitization in all cases.*

\* \* \*

The methodology from a saleability point of view will also be similar to that used for 30-year fixed rates and 5-1 Hybrids. We will view the exception assuming securitization and will no longer take into account whole loan buyers. In the past, this has caused some exceptions to be declined for Ratios, Balances and LTV/CLTV combinations. *Provided we can sell all of the credit risk (i.e. not be forced to retain a first loss place due to a 80% LTV, 60 Back-end ratios $3 million loan) we will approve the loan as a salable loan.* Finally, we will not be reviewing loans from an underwriting point of view but will rather be relying on Production to make certain that the loan [sic] meet all other underwriting Guideline and well [sic] have been reviewed for compliance acceptability and fraud.

81.    Individual Defendant Adler, a Depositor Defendant board member and Secondary Markets Managing Director, confirmed in an SEC Action deposition that the Secondary Markets SLD did not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

Q.    Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?

A.    We did.

Q. To your knowledge, was there a process by which such loans were approved?

\* \* \*

THE WITNESS: There generally was, yes.

Q. And what is your understanding of that process?

A. Well, I was -- I was at the tail end of that process. *There was -- we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will. And then there was this third tier which would come to me.* But essentially there were -- the tiering of guidelines related to the kind of the exception process. And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines. *And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.*

\* \* \*

Q.   *Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?*

A.   *That was the only criteria that we followed.*

**3.    The Risky Use Of Exceptions Was Well Known Within Countrywide But Was Concealed From Plaintiffs And Other Investors In The Certificates**

82.    Countrywide's internal documents and its employees' admissions provide evidence that, under management's direction, approval of "exceptions" was the rule – regardless of the risk associated with the loan – and in contravention of (i) its own policy that exceptions could be considered and approved only in moderation, and (ii) the Defendants' public statements about Countrywide's underwriting standards.

83.    A June 28, 2005 Corporate Credit Risk Committee presentation revealed to senior executives that one-third of the loans rejected by Countrywide's own underwriting guidelines and approved pursuant to exceptions missed "major" underwriting guidelines, and another one-third missed "minor" underwriting guidelines. The presentation also informed the committee that exceptions-based loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines.

84.    According to Confidential Witness ("CW") 1, an underwriter for Countrywide in the Jacksonville, Florida, processing center between June 2006 and April 2007, as much as 80% of the loans originated at Countrywide involved significant variations from the underwriting standards that necessitated a signoff by management.    According to CW 1, Countrywide was very lax when it came to underwriting guidelines.    Management pressured underwriters to approve loans and this came from "up top" because management was paid based, at least in part, on the volume of loans originated.    CW 1's manager told CW1 to approve as many loans as possible and push loans through.    According to CW1, most loans declined by underwriters would "come back to life" when new information would "miraculously appear" – which indicated to CW 1 that Countrywide was not enforcing its underwriting standards.

85.    An internal Countrywide presentation created by former Countrywide President and Chief Operating Officer, David Sambol, submitted in a criminal prosecution of a former Countrywide loan officer (*United States v. Partow*, No. 06-CR-00104 (HRH) (D. Alaska 2006)), listed the following objectives for the Exception Processing System:

- Approve *virtually every borrower and loan profile* with pricing add-on when necessary.
- Identify alternative program to meet borrower needs.
- Process and price exceptions on standard products for high-risk products.
- Process exceptions for:
  -- Credit Scores
  -- LTV (loan-to-value) amount
  -- Cash out amounts
  -- Property types

86.    Former Countrywide loan officer, Kourosh Partow, told an interviewer for Dateline NBC that if a borrower had a pulse, Countrywide would give the borrower a loan.

87.    Mozilo was acutely aware of the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines.    For example, in early

2006, HSBC exercised its contractual rights and forced Countrywide to "buy-back" many of the subprime 80-20 loans that it had purchased from Countrywide. Many of the HSBC "kick-outs" of defaulted loans were due to the fact that many of the underlying loans had been originated outside of Countrywide's underwriting guidelines. Following the HSBC incident, on April 13, 2006, Mozilo sent an e-mail to Sieracki and Sambol, stating that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]. In my conversations with Sambol he calls the 100% subprime seconds as the 'milk' of the business. Frankly I consider that product line to be the poison of ours."

88.     At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol, Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines.

89.     On May 29, 2007, Sambol attended a Credit Risk Committee Meeting, during which he was informed that even as Countrywide had been purportedly tightening guidelines, "loans continue[d] to be originated outside guidelines" primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding Secondary SID approvals." The presentation also included a recommendation from the credit management department that two divisions "cease to grant exceptions where no major competitor is offering the guideline."

90.     Countrywide's admission of its secret, rampant, and unjustified use of the exceptions process is further corroborated by the particularized allegations in a lawsuit by another financial guarantor—*Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.* The plaintiff in that lawsuit states that at two separate meetings between the parties

at Countrywide's headquarters on April 24, 2007 and December 13, 2007, Countrywide admitted "that it had, apparently since sometime in 2006, undertaken a deliberate practice to routinely make increased exceptions to and expansion of its underwriting guidelines . . ." According to Countrywide, "[t]he reason . . . for these undisclosed exceptions and expansion of the guidelines was to try to retain [its] existing share of the mortgage origination market." Countrywide also informed Financial Guaranty Insurance Company that it had discovered borrower misrepresentation, speculation, and fraud at an increasing rate in 2006, which it admitted "had been a significant factor in the underperformance of the 2006 securitized HELOC portfolios."

91.   In other recent lawsuits, Countrywide employees have confirmed the prevalence of these practices. One former Countrywide employee quoted in a class action complaint filed by Countrywide debt holders, *Argent Classic Convertible Arbitrage Fund v. Countrywide Financial Corp.*, stated that Countrywide routinely approved loans through the Exception Processing System that violated its underwriting guidelines.  And another former Countrywide employee, a former Assistant Vice President of Risk Management with Countrywide's Structured Loan Desk in Plano, Texas and an underwriter from 2004 until 2006 responsible for evaluating credit risk, stated that Countrywide's management "encouraged more and more loans" to be processed through the Exception Processing System beginning in 2004.  During 2006, Countrywide processed between 15,000 and 20,000 loans a month through the Exception Processing System.

92.   Similarly, in a wrongful dismissal lawsuit against Countrywide – *Zachary v. Countrywide Financial Corp. d/b/a Countrywide Home Loans Inc.* – former Countrywide Regional Vice President Mark Zachary alleged that Countrywide regularly approved stated income or reduced-documentation loans for applicants Countrywide had previously rejected