under its full-documentation loan program. In fact, Countrywide's loan officers would assist applicants in switching from full-documentation loans to reduced-documentation loans. Zachary alleges that Countrywide discharged him because he refused to engage in this activity.

93.     Zachary's allegations, and those of many other former Countrywide employees, are also featured in a shareholders derivative complaint – *In re Countrywide Fin. Corp. Derivative Litigation*, Lead Case No. 07-CV-06293 (C.D. Cal. 2007). In denying Countrywide's motion to dismiss the derivative complaint, the court highlighted Countrywide's dramatic loosening of its underwriting standards in branches across the United States. Specifically, the court held that the "numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards." In drawing this inference, the court noted that the allegations of misconduct came from Countrywide employees (i) located throughout the United States, (ii) in varying levels of the Countrywide hierarchy (including underwriters, senior underwriters, senior loan officers, vice presidents, auditors, and external consultants), and (iii) employed at varying times. In the court's words, these witnesses "tell what is essentially the same story - a rampant disregard for underwriting standards from markedly different angles."

94.     The court's holding was supported by references to, among other things, the particular allegations of a longtime Countrywide executive who stated "that particularly risky loans that were routed out of the normal underwriting process (because they violated underwriting standards) were in fact regularly being approved" with the knowledge of Defendant Sambol. The court similarly noted that "underwriters at various levels and offices attested to egregious instances of underwriting, involving, for example, previously declined loans that would 'come back to life' when new information qualifying the applicants would

'miraculously appear,' and loans that were provided pursuant to borrowers' patently ridiculous 'stated incomes.'"

95.     The complaint in a shareholder class action, *In re Countrywide Financial Corporation Securities Litigation* (C.D. Cal., Jan. 6, 2009), similarly alleges, based on statements from a loan underwriter in Countrywide's Consumer Markets Division, that "loan applications that should never have been approved were constantly kicked further up the corporate ladder until they reached a level where they would be approved by those driven solely by corporate profits and greed."

96.     The United States District Court denied Countrywide's motion to dismiss the federal scienter-based claims in the shareholder class action, holding that the allegations "present the extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws." The court explained that descriptions like "'high quality' are generally not actionable; they are vague and subjective puffery not capable of being material as a matter of law." But here, the complaint "adequately alleges that Countrywide so departed from its public statements that even 'high quality' became materially false or misleading." Countrywide recently agreed to settle this lawsuit by paying $600 million.

**D.      Defendants Knew That Countrywide's Stated Income Loan Products, Including "Prime" Pay-Option ARM Loans, Were Not Prudently Underwritten And Were Likely To Suffer Significant Defaults And Deficiencies, But Concealed These Facts From Plaintiffs And Other Investors In The Certificates**

97.     Countrywide's fraudulent loan originations did not end with its abandonment of its stated underwriting guidelines. Countrywide normally approved loans in which a borrower's income and/or assets were not verified. Such loans were called "limited" or "reduced"

41

documentation loans, and a large subset of those loans were called "stated income" loans. It is now clear that Countrywide covertly inflated the stated income of borrowers on loan applications for the loans that fueled its securitizations. These fraudulent practices materially affected every Certificate purchased by Plaintiffs; on average, 49% of the underlying loans per Certificate were approved using limited documentation, which included stated income loans.

98.     Many of these inflated incomes were in the loan files of Pay Option loans, an adjustable rate mortgage loan product that was ostensibly a "prime" or near prime product. Countrywide represented to Plaintiffs that a large percentage of the underlying loans originated by Countrywide Home and contained within the Certificates were "prime," or "conventional," indicating that these loans were of high credit quality. Included within this "prime" category of loans were Pay-Option ARM loans. Pay-Option ARM loans are adjustable rate mortgages which provide borrowers with the option of fully-amortizing, interest-only, or "negative amortizing" payments. Pay-Option loans increased from approximately 6% of loan production by year-end 2004 to approximately 19% by year-end 2005. In its 10-K for 2005, Countrywide assured the public that its Pay-Option loan portfolio had "a relatively high initial loan quality," and that it "only originate[d] pay-option loans to borrowers who [could] qualify at the loan's fully-indexed interest rates." Adjustable rate mortgage loans comprised a significant percentage of the Certificates' underlying loans; on average, 20% of the Certificates' underlying loans were adjustable rate mortgages.

99.     Defendants repeatedly assured Plaintiffs and other investors that Pay-Option ARM loans were prudently underwritten and of high quality. In 2005 and 2006, Mozilo made public statements touting Countrywide's Pay-Option ARM loans, stating, for example, that: "We are a big player in the pay-option and I/O product. *I'm not aware of any loosening of underwriting standards that creates any less of a quality of loan than we did in the past*" (July

26, 2005 Second Quarter Earnings call); "*pay option loan quality remains extremely high*" (April 27, 2006 First Quarter Earnings call); Countrywide's "origination activities are such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period" (*id.*); "Countrywide *views the product as a sound investment* for our Bank and a sound financial management tool for customers" (May 31, 2006 Sanford Bernstein Conference); "Performance profile of [the Pay-Option ARM loan] is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments" (*id.*); "[t]o help protect our bond holder customers, *we engage in prudent underwriting guidelines*" with respect to Pay-Option loans (September 13, 2006 Fixed Income Investor Forum).  In addition, Countrywide's 2006 Form 10-K stated that "[w]e believe we have *prudently underwritten*" Pay-Option ARM loans.

100.    Contrary to Defendant's statements in 2005, 2006 and 2007 characterizing Pay-Option ARM loans as being of "high credit quality," "prudently underwritten" and "prime," Defendants knew that a large percentage of these Pay-Option ARM loans were originated based on the borrowers' stated income, meaning that the borrowers provided no documentation proving their income.  Despite touting the security of the Pay-Option ARM loan products in public, Defendant Mozilo raised resounding alarms within Countrywide regarding the Company's risky reliance on stated income and reduced documentation for these loans but concealed his concerns from Plaintiffs and other investors.  For example, on April 4, 2006, in an internal email to Sambol regarding Pay-Option ARM loans, Mozilo stated "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that *it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies*."  Shortly thereafter, on May 19, 2006, Mozilo wrote an email to Sambol and Sieracki, stating that Pay-Option loans presented a long term problem "unless [interest] rates are reduced dramatically

from this level and there are no indications, absent another terrorist attack, that this will happen." On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process. On September 25, 2006, Mozilo wrote another email to Sambol and Sieracki, stating that *"[w]e have no way with reasonable certainty, to assess the real risk of holding these loans on our balance sheet."* Indeed, in the fall of 2006, Mozilo even recommended selling Countrywide's portfolio of Pay-Option ARM loans, recognizing the risks of retaining them on Countrywide's balance sheet.

101.    By early 2006, the management at Countrywide had been informed that the borrowers for one-third of the Pay Option loans held for investment at Countrywide had overstated their income by 50% or more.  Countrywide's Quality Control group performed a "4506 Audit" for the 10-month period ended on April 30, 2006, comparing the stated income from a borrower's loan application to the income reported by that borrower to the Internal Revenue Service, and concluded that *one-third of the Pay Option loans held for investment at Countrywide had income that was overstated by 50% or more.*  This audit report was distributed to Countrywide's management and was discussed at an April 24, 2006 Credit Risk Management Committee meeting.   Countrywide's Credit Risk Officer, Clifford Rossi, testified before the SEC that the "vast majority" of the income discrepancies revealed in the 4506 Audit were the result of fraud and misrepresentation.

102.    The results of the 4506 Audit were widely known within Countrywide, having been reported to the Credit Risk Committee, Countrywide's Chief Risk Officer, and Defendant Sambol, then head of loan production.  Sambol also shared the results of the audit with Mozilo, as reflected in a June 1, 2006 email from Mozilo, in which he wrote:

In a discussion with both Stan [Kurland] and Dave [Sambol] it came to my attention that *the majority of pay options being originated by us both wholesale and retail are based upon stated income. There is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records.*

103.    Countrywide did not reveal in either the Offering Documents or in other public disclosures the number or proportion of Pay-Option ARM loans that were based on stated income.   Moreover, although Countrywide did disclose the percentage of loans that were approved based on reduced documentation, including stated income, it did not disclose the results of the 4506 Audit demonstrating that a large percentage of the stated income information was misstated.

104.    Countrywide was not surprised by the results of the 4506 audit because the Company knew that its underwriting practices allowed, and in many cases encouraged, fraudulent information regarding income and employment. An investigation initiated by bond insurer MBIA prior to suing Countrywide for fraudulent representations related to Countrywide's mortgage loan practices, discussed above in ¶67, revealed that Countrywide's representations that its loan officers obtained at least telephonic verification of employment and salary with respect to its stated income loans were false.   MBIA discovered that Countrywide did not, in fact, obtain independent verification of income for borrowers who applied for these loans, which constituted a significant percentage of the total number of mortgage loans within the Certificates.

105.    The Mortgage Guaranty Insurance Corporation, an insurer of mortgage lenders against borrower defaults, is also embroiled in litigation with Countrywide.  Mortgage Guaranty filed an arbitration demand against Countrywide seeking to exercise its right to refuse to pay insurance claims on stated-income loans on which the borrowers defaulted, claiming that

Countrywide's representations regarding the loans were "riddled with materially false information" (the "*Mortgage Guaranty* Action"). In order to support its demand, Mortgage Guaranty hired investigators to root out representative examples of Countrywide's fraud, and provided ten of these representative examples in the complaint. In one example ("MGIC Certificate No. 25797915"), a borrower's application listed his occupation as a dairy foreman with a monthly stated income of $10,500. With those credentials, he qualified for a $350,000 primary residence mortgage loan with a reported debt-to-income ("DTI") ratio of 43.26%, within Mortgage Guaranty's eligibility threshold. After the borrower defaulted and Countrywide submitted a claim to Mortgage Guaranty, the insurer investigated the claim and uncovered the following facts: the borrower was actually a dairy milker making $1,100 per month who was not purchasing the home as a primary residence, and had a DTI of 403.40%, nearly ten times higher than what was represented by Countrywide. What is most shocking is that the borrower disclosed all of this information to the Countrywide loan officer:

> [The borrower] disclosed his true employment, his actual income, and his intention to help [borrower's son] purchase the property to loan officer [redacted]. [Loan officer] falsely informed [borrower] that [borrower] could help his son buy the home without bearing responsibility for the monthly mortgage payments. [Loan officer] described the transaction to [borrower] as "lending your son your credit." [Borrower], who cannot read English, signed the closing documents where [loan officer] told him to. [Loan officer] knew that [borrower] never intended to live at the property or to make any mortgage payments " The mortgage broker was completely aware of this fraud, according to the complaint. Nonetheless, the borrower got a $350,000 mortgage.

106. The other examples in the *Mortgage Guaranty* Action provide similar evidence of misfeasance, including inflated debt to income based on falsified income and loan-to-value ratios due to falsified appraisals, along with other deficiencies, all stemming from stated or reduced documentation loan applications which made it easy for the borrower and loan officer

46

to falsify information. The complaint by Mortgage Guaranty reads: "By about 2006, Countrywide's internal risk assessors knew that in a substantial number of its stated-income loans — fully a third — borrowers overstated income by more than 50 percent." The complaint adds, "Countrywide deliberately disregarded these and other signs of fraud in order to increase its market share."

107. Additional sources further confirm Countrywide's knowledge of the false information supplied by borrowers' for loan approval in stated income loans. According to Mark Zachary, a former Countrywide executive who has filed suit against Countrywide for wrongful termination, in and around 2006, Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application. Loan officers who learned that a loan application submitted under the full documentation program was unlikely to be approved "flipped" the application for consideration under a reduced documentation application program. According to Zachary, loan officers coached applicants on the level of employment income needed to qualify for a mortgage loan, and then accepted revised loan applications containing inflated reported incomes. The loan officers submitted the revised loan applications under a reduced documentation program for consideration by the Structured Loan Desk in Plano, Texas and Calabasas, California. According to Zachary, he complained to Countrywide's regional management about these practices, but his complaints were ignored.

108. Zachary's complaint also describes an instance where a Countrywide loan officer inflated an applicant's income on a loan application without the applicant's knowledge. According to Zachary, the customer sent an e-mail to Countrywide stating: "I was told that my loan had been turned over to Countrywide's internal fraud department for review because a loan officer increased my income figures without authorization in order to get me approved for a

stated income loan. I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it."

109.    Audrey Sweet of Maple Heights, Ohio, a victim of Countrywide's predatory lending practices, told a similar story of falsified loan documents in her testimony before the Joint Economic Committee of Congress on July 25, 2007. Ms. Sweet stated that when she reviewed her loan application after her loan had closed, she

> discovered several things [she] had apparently overlooked until then. The first was that my gross monthly income was recorded as $726 dollars more than it actually was. Secondly, I have two sets of loan documents, one that was created 10 days before we closed and one that was created the day of closing. The closing day documents list my assets as $9,400 in my Charter One Bank Account. I have never had $9,400 in the bank. Indeed, coming up on payday, I am fortunate to have $94 left. The final item I noticed was that the tax amount listed on the appraisal report was $1981.34, which comes to about $165.00 per month but Countrywide listed $100 as the tax amount.

110.    These individual cases of inflated borrower income are not isolated incidents. Instead, they are the product of Countrywide's corporate culture, as former Countrywide employees have made clear in related litigations.

111.    For example, the complaint in *In re Countrywide Financial Corp. Derivative Litigation* alleges, based on statements from a compliance officer who worked at Countrywide from 2001 to mid-2007, an external home loan consultant who worked at Countrywide from 2000 to 2007 and was responsible for originating prime loans for the residential market, and a former senior loan officer from Countrywide's Consumer Markets division in Atlanta Georgia, that Countrywide's no documentation loan process lacked independent verification and was openly abused.

112.    The second consolidated class action complaint in *In re Countrywide Financial Corporation Securities Litigation* alleges, based on statements from a Countrywide corporate-level Senior Vice President involved in financial reporting and analysis until 2007, that it was

generally known at Countrywide that "there was a lot of lying going on" in connection with stated income and stated asset loans.

113.   And in an NBC News report, one former Countrywide loan officer said that he had seen Countrywide supervisors stand by and watch as loan officers repeatedly entered fictitious income figures into Countrywide's system until it approved the borrower for a loan.  A borrower stated in the same report that a Countrywide loan officer advised her to double her salary when completing her own loan application.

114.   Since 2008, Attorneys General from various states have investigated Countrywide's lending practices and charged that Countrywide systematically departed from the underwriting standards it professed to use for originating residential loans.   The substantiated allegations in the complaints filed as part of these investigations further confirm the internal Countrywide documents and insider testimony discussed above.  For example, the Illinois Attorney General investigated Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled *Illinois v. Countrywide Financial Corp., et al.*, No. 08CH22994 (the "Illinois AG Complaint"). The California Attorney General also investigated Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *California v. Countrywide Financial Corp., et al.*, No. LC081846 (the "California AG Complaint").   Many of the allegations in the Illinois and California AG Complaints were confirmed by investigations in other states such as Connecticut, Washington, West Virginia, Indiana and Florida.  Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by 11 states, including California and Illinois, agreeing to implement an estimated $8.4 billion program to modify pre-2008 Countrywide-originated mortgages.

49

115.    According to the Illinois AG Complaint, Countrywide employees whom the Illinois AG interviewed stated that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrowers were able to repay the loans. With respect to stated income loans, Countrywide employees explained to the Illinois AG that, while the Company had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.   To supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its employees to utilize a website, www.salary.com, to determine the reasonableness of a potential borrower's stated income.  However, this website was actually used by Countrywide employees to gauge how much income needed to be "stated" in order to approve the loan, regardless of whether that stated income was legitimate.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.

116.    A former California loan officer for Countrywide quoted in the California AG Complaint further explained that Countrywide's loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make," after which the borrower would state that he or she made X amount of income.

117.    The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  For example, according to the Illinois AG Complaint: (i) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated

50

incomes; and (ii) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

118.    Similar to the Illinois AG Complaint, the California AG Complaint also alleged that Countrywide departed from its stated underwriting standards.  For example, the Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans.

119.    The absence of readily obtainable income verifications was also reported in an April 6, 2008 article in the *New York Times*.  The article noted that even though Countrywide had the right to verify stated income on an application through the IRS (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.  As the 4506 Audit demonstrated, had Countrywide made any attempt to verify borrowers' stated income with the IRS at the time of application, it would have shown that at least one-third of the Pay Option loan applications were overstated by 50% or more.

**E.     Countrywide Retained The Best Quality Loans For Its Own Portfolio, Selling Only The Riskiest Loans To Plaintiffs And Other Investors**

120.    Countrywide represented in the Prospectus Supplements that it would not select loans for securitization "in a manner intended to affect the interests of the certificateholders adversely."  This representation was material to Plaintiffs because they relied on Countrywide's assurance that the loans included in the pools for the Certificates were high-quality loans with low credit risk.  However, it was Countrywide's practice to act adversely to the interests of Plaintiffs and other Certificate investors.  First, as described above, Countrywide's Secondary Markets SLD was created for the sole purpose of approving otherwise unapprovable loans as

long as they could be sold in their entirety through securitizations. Second, Countrywide protected its own investment portfolio, choosing only the best quality loans for retention, while unloading the riskiest loans to secondary market investors, including Plaintiffs. Countrywide's former Chief Risk Officer, Clifford Rossi, confirmed, in testimony before the SEC, that Countrywide generally tried to "cherry-pick" the best of the Countrywide Home loan production for its "Held for Investment" portfolio:

> Q.    Now, the loans that the bank was portfolioing [sic], was there a particular strategy that the bank was using to select those loans?
>
> A.    Yeah. So -- so the general strategy that had been provided to me from people like Carlos Garcia [Executive Managing Director of Banking and Insurance at Countrywide] and Jim Furash [President of Countrywide Bank] and that would have been conveyed back again from -- from the parent was that -- and this is when I first started there, was that *the bank was to originate and to cherry pick the better quality assets*.

121.    Defendants knew that this practice of cherry-picking the higher quality loans for Countrywide's portfolio would adversely affect the secondary market securitizations. In an August 2, 2005 email from Defendant Sambol to Defendants Mozilo and Kurland (CEO, President and Chairman of each of the Depositor Defendants) and to Carlos Garcia, Sambol wrote: "While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and *what remains to be securitized/sold is overly concentrated with higher risk loans*."

**F.    Countrywide Pressured Appraisers To Submit Falsified Appraisal Reports**

122.    An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the price and risk of MBS certificates. The LTV ratio expresses the amount of the

mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000). The "value" of the mortgaged property, other than with respect to refinance loans, is generally the lesser of: (i) the appraised value determined in an appraisal by the loan originator at the time of the origination, or (ii) the sale price for such property.

123. From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property. Third, a high LTV means that, in the event of default or foreclosure, there is no remaining equity to pay for the fees and expenses related to a foreclosure.

124. Consequently, the LTV ratios of the loans underlying MBS are important to investors' assessment of the value of the MBS. Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the MBS. All of the Certificates represented that no LTV would exceed 100%, and many promised an even lower threshold of 95%.

125. The Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans. In each Prospectus Supplement, Countrywide represented that one or more appraisals were obtained for nearly every mortgage loan, and that

53

these appraisals were "independent."  As originator and securitizer of the loans, Countrywide had an incentive to inflate the value of properties if that inflation would allow a loan to be approved when it otherwise would not have been. But loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the MBS investor in foreclosure.  An independent appraisal is necessary to ensure that appraisals are not inflated.

126.    Many mortgage loan originators, including Countrywide, allowed the sales personnel or account executives to order and control the appraisal process.  These personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible.   These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again.

127.    According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much 10%. This meant one out of two appraisals were still within an acceptable tolerance for our end investors.  Our experience showed that 10% was the most an appraisal could be overvalued and still be purchased by these investors.  Another quarter that we reviewed were overvalued by 11-20%.  These loans were either declined or we reduced the property value to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic.  ***Throwing a dart at a board while blindfolded would've produced more accurate results.***

128.    Mr. Bitner testified about the implications of inflated appraisals:

If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself. We saw it on several occasions. We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant. In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country.

\*          \*          \*

If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to a lack of funds. Inevitably, this would have forced sellers to drop their exorbitant asking prices to more reasonable levels. The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.

Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

129.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on Banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis by which appraisers issued their appraisal without reasonable bases for doing so.

130.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review*, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

131.    The representative loan file investigation performed in the *Mortgage Guaranty Action* also corroborates the prevalence of a corrupt appraisal process which resulted in inflated appraisals on Countrywide's mortgaged properties. For example, the mortgaged property in MGIC Certificate No. 25616578 was a home in Atlanta, Georgia, with a reported appraisal value of $395,500. Based on the appraised value and a 10% down payment of $39,500, that borrower's $355,500 loan carried a LTV ratio of 90%. After the borrower defaulted and Mortgage Guaranty received Countrywide's insurance claim, Mortgage Guaranty discovered that there was no reasonable basis for the appraisal based on past home prices, and that the fair market value was actually $277,000, with a LTV ratio of 128.34%.

132.    In *Capitol West Appraisals, LLC v. Countrywide Financial Corp.*, *Clark v. Countrywide Home Loans, Inc.*, and *Johnson v. KB Home* – putative class actions filed on behalf of real estate appraisers and homeowners nationwide – the plaintiffs allege that Countrywide engaged in widespread appraisal-related misconduct by inflating the value of properties in order to support the loans that it wished to make. Plaintiffs in *Clark* allege that Countrywide often required the borrower to have the property appraised by its affiliates, LandSafe, Inc. and LandSafe Appraisal Services, Inc.   This way, Countrywide was able to control the appraisal process and influence and inflate the appraised values assigned to properties on which it was lending. Plaintiffs in these lawsuits allege that this conduct violated

56

the federal law requiring appraisals prepared by an in-house or "staff appraiser" at a bank – as opposed to an independent contractor – to "be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transactions, and have no direct or indirect interest, financial or otherwise, in the property." Further, Countrywide "engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that meet Countrywide's business objectives even if the use of such appraisal technique is improper and in violation of industry standards."  Countrywide allegedly black-listed appraisers who did not provide appraisal reports consistent with Countrywide's expectations.

133.     The allegations in *Capitol West Appraisals*, *Clark*, and *Johnson* are consistent with the allegations of former Countrywide Regional Vice President Mark Zachary, who alleges that Countrywide loan officers were permitted to discard appraisals that did not support loan transactions in favor of appraisals by replacement appraisers that would support a qualifying loan-to-value ratio.  Indeed, Zachary's lawsuit details systematic appraisal fraud perpetrated by Countrywide with the knowledge and acquiescence of Countrywide executives.  Specifically, Zachary alleges that an appraiser known to Countrywide executives was strongly encouraged to inflate the appraised value of homes by as much as six percent to allow the homeowners to "roll up" all closing costs.  As Zachary noted, this conduct misled the buyer and the secondary mortgage market by overstating the value of the property securing the mortgage note.  Zachary alleges that Countrywide executives rebuffed his persistent overtures to address this issue.

134.     As a result of the appraisal process misconduct described above, the appraised value of properties that secured the loans underlying the Certificates was inflated.

G.     **The Credit Ratings Assigned To Countrywide's Certificates Materially Misrepresented The Credit Risk Of The Certificates**

135.    The AAA and otherwise investment grade credit ratings of the Certificates were a factor in Plaintiffs' purchase of the Certificates.    Because Plaintiffs are conservative institutional investors, they purchased only investment-grade Certificates, over 90% of which were rated AAA.  They therefore purchased purportedly low-risk securities that were high in the capital structure of the Certificate offerings.  Thus, Plaintiffs relied to their detriment on the ratings and the Defendants' representations regarding the ratings in the Offering Documents.

136.    "Investment grade" products are understood in the marketplace to be stable, secure and safe.  Using S&P's scale, "investment grade" ratings are AAA, AA, A and BBB, and represent, high credit quality (AAA), upper-medium credit quality (AA and A) and medium credit quality (BBB).  Any instrument rated below BBB is considered below investment grade or "junk bond."

137.    The Defendants well understood (and banked on) the important role the credit ratings played in the MBS markets. They featured the ratings prominently in the Offering Documents and discussed at length the ratings received by the different tranches of the Certificates, and the bases for the ratings. Yet, the Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by the Defendants to the credit rating agencies.

138.    Each prospectus supplement states that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.  Over 93% of the Certificates purchased by Plaintiffs were AAA-rated tranches, and the remainder were investment grade. The AAA rating denotes "high credit-quality," and is the same rating as those typically assigned to bonds backed by the full faith and

58

credit of the United States Government, such as Treasury Bills.  Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to nil. According to Standard and Poors, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about .094% per year with no year higher than 0.41%.  The Certificates did not deserve these investment grade ratings, as evidenced most clearly by the fact that over 90% of the Certificates have now been downgraded to junk, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default.

139.    The credit rating agencies received enormous revenue from the issuers who paid them for rating the products they sold.  Because the desired rating of a securitized product was the starting point for any securities offering, the credit rating agencies were actively involved in helping Countrywide structure the products to achieve the requested rating. As a result, the credit rating agencies essentially worked backwards, starting with Countrywide's target rating and thereafter working toward a structure that could conceivably yield the desired rating.  To estimate the expected losses or probability of default, the credit rating agencies used historical data to estimate the likely sensitivity of the expected loss or probability of default to underwriting characteristics of the loan, the experience of the originator and servicer, and the local and national economic conditions.  Based on the expected losses or the probability of default, the cash flows available to each of the tranches were simulated.  Once the cash flows were simulated, the rating agencies and Countrywide then determined how much credit enhancement would be made available to each tranche of the Certificates, with an ultimate goal of maximizing Countrywide's profit.

140.   A 2008 SEC Report entitled, "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies" ("Summary Report") revealed that the issuers and the credit rating agencies worked together so that securities would receive the highest ratings:

> [T]ypically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

141.   As a result of this collaboration with the credit rating agencies, Countrywide was able to manipulate the system to achieve inflated ratings. For example, through repeated interactions with the credit rating agencies, Countrywide could effectively reverse engineer aspects of the ratings models and then modify the structure of a financing to improve its ratings without actually improving its credit quality.

142.   This rating process was further compromised by the practice of "rating shopping." Countrywide did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating. This practice created, essentially, bidding wars where the issuers would hire the agency that provided the highest rating for the lowest price. The credit rating agencies were paid only if they provided the desired investment grade ratings, and only in the event that the transaction closed with those ratings. "Ratings shopping" jeopardized the integrity and independence of the rating process.

143.    The credit ratings of the Certificates were further compromised by misinformation provided by Countrywide regarding the abandonment of its underwriting standards, rampant use of aggressive exceptions, the company's knowledge of pervasive fraud in the stated income loan programs, and the inflated appraisals assigned to the underlying collateral, as described above.

144.    Subsequent downgrades confirm that the investment grade ratings reported in the Offering Documents were unjustifiably high and misstated the true credit risk of the Certificates purchased by Plaintiffs.   Beginning in the spring of 2008, the Certificates purchased by Plaintiffs also became subject to these rating agency downgrades. Today, well over 90% of the Certificates – all initially awarded investment grade ratings (mostly AAA) – have been downgraded to junk, and the vast majority of the remainder have been downgraded at least one level.   The *en masse* downgrade of AAA-rated Certificates indicates that the ratings set forth in the Offering Documents were false, unreliable and inflated.

145.    The Countrywide Defendants knew that the AAA and other investment grade ratings assigned to the Certificates were false because, unbeknownst to Plaintiffs, the underwriting and appraisal standards of Countrywide Home had been abandoned and, as such, no reliable estimate could be made concerning the level of enhancement necessary to ensure that the top tranches purchased by Plaintiffs were of AAA quality.   By including and endorsing these AAA ratings in the Prospectus Supplements, Defendants were making a false representation that they actually believed that the AAA ratings were an accurate reflection of the credit quality of the Certificates.

**H.** **Countrywide Failed To Ensure That Title To The Underlying Loans Was Effectively Transferred**

146. An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

147. The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law). Generally, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

148. In order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the trust. Rather, the notes and security instruments are generally initially transferred from the originator (*e.g.*, Countrywide Home) to the depositor (*e.g.*, CWALT), either directly or via one or more special-purpose entities established by Countrywide Financial. After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

149.   In addition, the PSA generally requires the transfers of the mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC").

150.   The applicable state trust law generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery, and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

151.   The Offering Documents for each offering of the Certificates represented in substance that the issuing trust for that offering had obtained good title to the mortgage loans comprising the pool for the offering.   In reality, however, Countrywide routinely failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments to the issuing trusts.  In *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an RMBS issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage.  Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Servicing for almost ten years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing.  Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything . . . ."  She testified that Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan.

63

152.    Even though DeMartini was presented by Countrywide as a witness in an attempt

to prove that the loan documents had been validly transferred to the issuing trust, her testimony

actually proved that the loan documents were never validly transferred.  She testified that an

allonge to the promissory note, which purported to transfer the note to the trust by indorsement,

was prepared only in preparation for the litigation in 2009, long after the purported transfer of

the note to the trust in 2006, and was never delivered to the trustee.  Indeed, she testified that

there was no ordinary business practice of signing an allonge at the time a note was purportedly

transferred.

153.    DeMartini also testified that the original note was retained by Countrywide and

was never delivered to the trustee.  Most significantly, she testified on direct examination that

not delivering the original note to the trustee was Countrywide's standard business practice:

> Q.    Ms. DeMartini, is it generally the custom to – for your
> investor [*i.e.*, the issuing trust] to hold the documents?
>
> A.    No.  They would stay with us as the servicer.
>
> Q.    And are documents ever transferred to the investor?
>
> A.    If we service-release them they would be transferred to
> whomever we're service-releasing them to.
>
> Q.    So I believe you testified Countrywide was the originator
> of this loan?
>
> A.    Yes.
>
> Q.    So Countrywide had possession of the documents from the
> outset?
>
> A.    Yes.
>
> Q.    And subsequently did Countrywide transfer these
> documents by assignment or an allonge?
>
> A.    Yes.
>
> Q.    And –

64

> A.    Well, transferred the rights, yes, transferred the ownership,
> not the physical documents.
>
> Q.    So the physical documents were retained within the
> corporate entity Countrywide or Bank of America?
>
> A.    Correct.
>
> Q.    Okay.  And would you say that this is standard operating
> procedure in the mortgage banking business?
>
> A.    Yes.  It would be normal – the normal course of business as
> the reason that we are the servicer, as we're the ones that are doing
> all the servicing, and that would include retaining the documents.

154.    In response to questioning by the Bankruptcy Judge, DeMartini again testified

that "I do know that it is our normal course of action with the loans that we service that we are

the ones that retain the – that we retain those documents."  In response to the Court's question

whether the documents are "ever moved to follow the transfer of ownership," DeMartini testified

that "it is not customary for them to move."

155.    At a subsequent hearing in September 2009, Countrywide's counsel stated that

> [A]lthough . . . the UCC and the Master Servicing Agreement apparently requires
> that, procedure seems to indicate that they don't physically move documents from
> place to place because of the fear of loss and the trouble involved and the people
> handling them.  They basically execute the necessary documents and retain them
> as long as servicing's retained.  The documents only leave when servicing is
> released.

156.    Based on the evidence quoted above, Chief Bankruptcy Judge Judith H. Wizmur

held in November 2010 that the Bank of New York, as trustee for the issuing trust, could not

enforce the mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the
> fact that the owner of the note, the Bank of New York, never had possession of
> the note, is fatal to its enforcement.  Second, upon the sale of the note and
> mortgage to the Bank of New York, the fact that the note was not properly
> indorsed to the new owner also defeats the enforceability of the note.

*Kemp v. Countrywide Home Loans, Inc.*, No. 08-18700-JHW, Slip Op., at *10-11 (Bkrtcy. D.N.J. Nov. 16, 2010). Judge Wizmur further held that Countrywide Servicing also could not enforce the mortgage loan, because as an agent for the owner of the note, Countrywide Servicing had no more authority to enforce the note than its principal, the Bank of New York. *Id.* at *21.

157. As DeMartini testified, Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for MBS transactions, but rather retained the original documents itself. Thus, Defendants failed to validly transfer the promissory notes and security instruments for many of the mortgage loans underlying the Certificates purchased by Plaintiffs to the issuing trusts for the Certificates.

## V.   PLAINTIFFS' INVESTMENT IN THE COUNTRYWIDE CERTIFICATES

158. The Certificates for all offerings were issued pursuant to the Offering Documents, and in a few instances, private placement memoranda. These documents generally explained the structure and provided an overview of the Certificates. The Depositor Defendants and Countrywide Securities prepared the Offering Documents, and the Securities Act Individual Defendants signed the Registration Statements.

159. The Prospectus Supplements filed with the SEC contained detailed descriptions of the mortgage pools underlying the Certificates. The respective Prospectus Supplements provided the specific terms of the particular Certificate offering. Each Prospectus Supplement included tabular data concerning the loans underlying the Certificates, including (but not limited to) the type of loans; the number of loans; the mortgage rate and net mortgage rate (the mortgage rate net of the premium for any lender paid mortgage insurance less the sum of the master servicing fee and the trustee fee on the mortgage loan); the aggregate scheduled principal balance of the loans; the weighted average original combined LTV ratio; occupancy rates; credit enhancement; and the geographic concentration of the mortgaged properties. The Prospectus

Supplements also contained a summary of Countrywide's underwriting and appraisal standards, guidelines and practices. The Registration Statements incorporated by reference the subsequently filed Prospectuses and Prospectus Supplements.

160.    The chart in Exhibit 1 identifies (i) each Certificate Offering and tranche in which Plaintiffs purchased; (ii) the full  name of the Offering; (iii) the issuing entity; (iv) the corresponding Registration Statement file number; (v) the Depositor Defendant who issued each Certificate; (vi) the issue date of the Certificate; (vii) the purchasing Plaintiff; and (viii) the date of the purchase.  Countrywide Home was the Seller/Sponsor for each Offering, Countrywide Servicing was the servicer of each Offering, and Countrywide Securities was an underwriter of each Offering,

161.    The Dexia Plaintiffs, TIAA, TIAA-CREF LIC and TGM made their investment decisions using internal investment personnel.  All investment decisions for the New York Life Plaintiffs, CREF and the TIAA-CREF Funds were made by their investment managers, identified in ¶¶ 16-17.  In deciding to purchase the Certificates, Plaintiffs or their respective investment managers relied on the Countrywide Defendants' false representations and omissions of material fact regarding Countrywide's underwriting standards and the characteristics of the mortgage loans underlying the Certificates. But for the Countrywide Defendants' fraudulent representations and omissions, Plaintiffs would not have purchased the Certificates.

162.    Plaintiffs or their investment managers reasonably relied upon the Countrywide Defendants' representations in the Offering Documents and in Defendants' public statements regarding loan quality and Countrywide's reputation.  Plaintiffs did not know at the time they purchased the Certificates, and could not have known, that Countrywide had stopped following its underwriting guidelines to the point of abandoning those guidelines, leading to a drastic

increase in the origination of risky loans, nor did they know that the property appraisals secured by Countrywide were not independent and resulted in false appraisal values. Plaintiffs also did not know that Countrywide knowingly or recklessly accepted false information about material facts such as borrowers' stated income and intention to live in the mortgaged properties, which caused the Countrywide Defendants' representations to Plaintiffs to be false. If Plaintiffs had known these and other material facts regarding the Countrywide Defendants' fraudulent misrepresentations and omissions of material fact, Plaintiffs would not have purchased the Certificates.

163. The Countrywide Defendants' misrepresentations and omissions of material facts caused Plaintiffs to suffer losses on the Certificates, because the Certificates were in fact far riskier—and their rate of default far higher—than the Countrywide Defendants had described them to be. The mortgage loans underlying the Certificates experienced defaults and delinquencies at a much higher rate due to Countrywide's abandonment of its loan-origination guidelines.

164. Plaintiffs are located and headquartered in New York and they or their investment managers made the decisions to purchase the Certificates.

165. Plaintiffs or their investment managers decided to purchase each Certificate identified in Exhibit 1 on the basis of the information contained in the applicable Offering Documents filed with the SEC (or the applicable private placement memoranda), and based on additional information provided to each Plaintiff's investment personnel or managers by Defendant Countrywide Securities or other brokers involved in the sale of the Certificates, including Defendants' public statements, as described herein. In connection with the offers and sales of the Certificates to Plaintiffs, Countrywide Securities provided directly or indirectly to each Plaintiff's investment personnel or managers in New York the Offering Documents and

additional documents, such as statistical tables to be included in the Prospectus Supplements. These documents included term sheets, pooling and servicing agreements, computational material, data regarding the LTV and debt-to-income ratios of the pools, and computer models of the financial structures of the securitizations. Similar information was sent to and analyzed by Plaintiffs' investment personnel and managers if the Certificate was sold to them in the secondary market.

166.    Investment personnel of or investment managers for each Plaintiff reviewed and analyzed the information provided directly or indirectly by Countrywide Securities with respect to each offering of Certificates and performed various analyses of the Certificate-specific data for each offering before deciding to purchase Certificates in the offering.   The analyses conducted by each Plaintiff before deciding to purchase a Certificate included various credit analyses based on the information provided by Countrywide Securities with respect to both the credit characteristics of the mortgage loan pool (including, for example, geographic concentration; weighted average life; fixed- or floating-rate loans; full-, low-, or no-documentation "stated income" loans; and owner-occupied, second home, or investment properties), and the structure of the securitization with respect to the seniority and risk characteristics of the particular tranche of Certificates (including, for example, position in the payment "waterfall").

167.    Thus, each Plaintiff relied on the information in the term sheets, computational material, and other data provided directly or indirectly by Countrywide Securities for each offering of the Certificates.    Each Plaintiff also relied on the Offering Documents' representations and Defendants' public statements about the underwriting guidelines that were purportedly followed in originating the mortgage loans for Countrywide's Certificates.

168.   These documents contained numerous statements of material facts about the Certificates, including statements concerning: (i) Countrywide Home's and any other applicable mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Certificates; (ii) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (iii) the LTV ratios, debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (iv) Countrywide Securities' due diligence of the loans and the mortgage originators' – specifically Countrywide Home's – underwriting practices; and (v) various forms of credit enhancement applicable to certain tranches of Certificates.

169.   These statements of material facts were untrue because: (i) Countrywide Home and the other mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (ii) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (iii) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of Countrywide Home's and the other mortgage originators' acceptance of untrue information from mortgage applicants. For example, Countrywide Home and the other mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported income. Stated income loans were therefore known among personnel of Countrywide Home and the other mortgage originators as "liar loans."

170.   In addition to the untrue statements and omissions in the documents provided to each Plaintiff, Countrywide Securities and Countrywide Financial often made additional untrue

oral statements about the Certificates to each Plaintiff or its investment managers during face-to-face meetings and telephone conversations in connection with the offer and sale of the Certificates between 2005 and 2007, and through investor conference calls discussing the quality of Countrywide's loan portfolios.   For example, Countrywide Securities and Countrywide Financial personnel represented to each Plaintiff or its investment manager that Countrywide performed due diligence on the loans in its securitizations, re-underwrote the loans, performed good loan servicing, and thus offered a superior MBS platform than Countrywide's competitors.   Each Plaintiff relied on these representations in deciding to purchase Certificates from Countrywide.   Plaintiffs also relied on the public statements made by the individual Defendants Mozilo and Sambol to the public regarding Countrywide's prudent underwriting and adherence to the highest origination standards.

## VI.   DEFENDANTS' FALSE AND MISLEADING MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

171.   The Offering Documents pursuant to which Plaintiffs purchased their Certificates contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (i) Countrywide's and other originators' underwriting processes and guidelines by which the loans were originated, including the prevalence and type of exceptions to those guidelines being applied to the underlying loans, and the rampant fraud in stated income loans; (ii) the value of the underlying real estate securing the loans, in terms of LTV ratios and the appraisal standards by which such real estate values were measured; (iii) the credit ratings of the Securities; and (iv) the adequacy of Countrywide's transfer of good title and legal ownership of the underlying loans to the issuing trusts.

A.      **Defendants Made False And Misleading Statements Regarding
Countrywide's Underwriting Guidelines**

172.    Countrywide Home Loans originated and/or packaged the mortgage loans that

were included in the pools for the Certificates.  The Prospectus Supplements for the Certificates

all contained identical or materially similar statements of material fact regarding Countrywide's

underwriting standards and practices.

173.    Depositor Defendants CWALT and CWMBS issued approximately 73% of the

Certificates at issue in this action.  Nearly 78% of the  CWALT Prospectus Supplements and

70% of the CWMBS Prospectus Supplements made the following misrepresentations regarding

Countrywide's underwriting guidelines and practices:

> ***All of the mortgage loans in the trust fund will have been
> originated or acquired by Countrywide Home Loans in
> accordance with its credit, appraisal and underwriting standards.
> Countrywide Home Loans' underwriting standards are applied in
> accordance with applicable federal and state laws and
> regulations.***  Except as otherwise provided in this prospectus
> supplement, the underwriting procedures are consistent with those
> identified under "Mortgage Loan Program — Underwriting
> Process" in the prospectus.

The  remaining  22%  of  the  CWALT  Prospectus  Supplements  and  30%  of  the  CWMBS

Prospectus Supplements contained identical disclosures regarding the loans, but qualified that

Countrywide originated "a portion," "substantially all" or a specific percentage "of the mortgage

loans  in  the  trust  fund."   The  remaining  27%  of  the  Certificates  were  issued  by  Depositor

Defendants  CWABS  and  CWHEQ.    Those  Prospectus  Supplements  contained  similar

misstatements, generally stating that the mortgage loans to be included in the Offering "will have

been  originated  substantially  in  accordance  with  Countrywide  Home  Loans'  underwriting

criteria" for closed-end second lien mortgage loans or for  credit blemished mortgage loans.

72

174.   All of the Prospectus Supplements issued by Depositor Defendants CWALT, CWMBS and CWHEQ and 13% of the Prospectus Supplements issued by Depositor Defendant CWABS made the following material misrepresentations:

> *Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.* Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

The remaining CWABS Prospectus Supplements contained similar misstatements, stating that "[t]he underwriting guidelines are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the Mortgage Loan."

175.   All of the CWALT, CWMBS and CWHEQ Prospectus Supplements, and 13% of the CWABS Prospectus Supplements represented that:   *"Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."*   The remaining 87% of the CWABS Prospectus Supplements represented that "On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. . . .

It is expected that a significant number of the Mortgage Loans will have been originated based on these types of underwriting exceptions."

176.    All of the CWALT and CWMBS Prospectus Supplements, 71% of the CWABS Prospectus Supplements and 75% of the CWHEQ Prospectus Supplements represented that "Countrywide Home Loans *will represent and warrant to the depositor in the pooling and servicing agreement . . . the selection was not made in a manner intended to affect the interests of the certificateholders adversely*."

177.    The above statements of material facts were untrue when made because, as explained above in ¶¶ 36-145, they failed to disclose that Countrywide: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume for securitizations; (iv) routinely allowed fraudulent representations of an applicant's stated income and, in many cases, knowingly falsified the stated income; and (v) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.   Moreover, Defendants routinely acted adversely to the interests of Plaintiffs and other Certificate holders by knowingly selecting risky loans for the Certificates while "cherry picking" the best loans for Countrywide's own portfolio.   ¶¶ 120-121.

178.    On September 1, 2004, Mozilo wrote an e-mail to Stan Kurland and Keith McLaughlin in which he stated:   "As I look at production trends, not only at Countrywide, but also with other lenders, there is a clear deterioration in the credit quality of loans being originated over the past several years. In addition, from my point of view, the trend is getting worse as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate."   However, in a March 15, 2005 Piper Jaffray Investor Conference quotes Mozilo as

saying: "I will say this to you that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share." Mozilo once again defended Countrywide's underwriting standards in Countrywide's Second Quarter 2005 Earnings call held on July 26, 2005, when he stated: "I am not aware of any change of substance in underwriting policies. If they are referring to the fact that we are participating in pay-option and I/O product and they are defining that as a loosening of standards, if that is the definition, then that would be correct. We are a big player in the pay-option and I/O product. I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past."

179. At a Q2 2004 meeting of Countrywide's Corporate Credit Risk Committee ("CCRC"), Countrywide's Chief Credit Officer, John McMurray, delivered a presentation entitled "Credit Risk is Increasing," explaining to senior executives, including Defendant Sambol, that Countrywide's underwriting standards had become more aggressive, and more loans were being originated under riskier loan programs, with riskier features and at higher CLTVs. During his presentation, McMurray explained to Countrywide's senior executives that as underwriting guidelines expand, the probability of a loan going into default or serious delinquency increase.

180. In a September 9, 2004 email memorandum from McMurray to Mozilo, McMurray explained that "[l]oan quality is a significant credit risk factor[,]" and noted that Countrywide's "move to more aggressive underwriting guidelines have increased risk." This memorandum was widely shared within Countrywide.

181. In response to the rampant use of Countrywide's "matching strategy" and its approval of any loan as long as it could be securitized, Countrywide's Credit Risk Management department futilely attempted to rein in some of these abuses by issuing a "no exceptions

policy" with respect to the underwriting guidelines applicable to the subprime 80/20 loan products in January 2006. This policy was directed in response to Countrywide's "buy-back" in early 2006 of many 80/20 loans in default that had been sold to HSBC and were "kicked out" by HSBC because they had been underwritten outside of Countrywide's underwriting guidelines. However, according to the testimony of McMurray, Countrywide's Chief Risk Officer, the "no exceptions policy" for 80/20 loans was completely ignored by Countrywide's SLD personnel who continued to originate 80-20 loans pursuant to exceptions. Ultimately, Frank Aguilera, a Managing Director in Secondary Marketing at Countrywide, wrote in a June 12, 2006 email to other Managing Directors, including Chief Risk Officer John McMurray, that "there was no real effort to impose the new controls at the production end."

182. Defendant Mozilo understood the risks of these products to the Company and to investors, yet did not stop them. In a March 27, 2006, email from Mozilo to several Countrywide executives, including Defendant Sambol, Mozilo wrote that the 80/20 loans were "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation for guidelines be permitted irrespective of the circumstances." However, Countrywide's production and secondary marketing divisions continued to ignore the policy and continued granting these exceptions with respect to 80/20 loans, as reflected by Chief Risk Officer McMurray on a September 7, 2007 email explaining that the secondary and production SLDs "basically continued to operate as though they never received this policy."

**B. Defendants Made Untrue Statements And Omissions Regarding Appraisals And LTV Ratios**

183. The adequacy of the mortgaged properties as security for repayment of the loans was purportedly determined by appraisals. The Prospectus Supplements represented that independent appraisals were prepared for each mortgaged property and that reports were

prepared to substantiate these appraisals. For example, all of the Prospectus Supplements for

the CWALT and CWMBS Certificates contained the following representation:

> *Countrywide Home Loans obtains appraisals from independent
> appraisers or appraisal services for properties that are to secure
> mortgage loans* . . . The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in
> acceptable condition. *Following each appraisal, the appraiser
> prepares a report which includes a market data analysis based on
> recent sales of comparable homes in the area and, when deemed
> appropriate, a replacement cost analysis based on the current
> cost of constructing a similar home. All appraisals are required
> to conform to Fannie Mae or Freddie Mac appraisal standards
> then in effect.*

184.     The Prospectus Supplements for the CWABS and CWHEQ Certificates made

similar statements about appraisals of the real estate securing the loans underlying the

Certificates, with most including the following statement:

> Countrywide Home Loans' underwriting standards are applied in
> accordance with applicable federal and state laws and regulations
> and *require an independent appraisal of the mortgaged property
> prepared on a Uniform Residential Appraisal Report (Form
> 1004) or other appraisal form as applicable to the specific
> mortgaged property type.* Each appraisal includes a market data
> analysis based on recent sales of comparable homes in the area
> and, where deemed appropriate, replacement cost analysis based
> on the current cost of constructing a similar home and generally is
> required to have been made not earlier than 180 days prior to the
> date of origination of the mortgage loan. *Every independent
> appraisal is reviewed by a representative of Countrywide Home
> Loans before the loan is funded, and an additional review
> appraisal is generally performed in connection with appraisals
> not provided by Landsafe Appraisals, Inc., a wholly owned
> subsidiary of Countrywide Home Loans* ... Variations in
> maximum loan amount limits are permitted based on compensating
> factors.

185.     The Prospectus Supplements provided information regarding LTV ratios, in

association with various loan groupings, including by loan type and documentation level,

property type and geographical location. All of the Prospectus Supplements for the CWALT

Certificates, 70% of the CWABS Certificates, 20% of the CWMBS Certificates and 75% of the CWHEQ Certificates stated that, with respect to non-conforming loans, Countrywide Home's standard guidelines:

> generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

186.    Certain Prospectus Supplements also stated that "[n]o Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%":

> Countrywide Home Loans' underwriting standards permit first mortgage loans with loan-to-value ratios at origination of up to 100% and second mortgage loans with combined loan-to-value ratios at origination of up to 100% depending on the program, type and use of the property, documentation level, creditworthiness of the borrower, debt-to-income ratio and loan amount.

187.    The representations regarding appraisals and LTV ratios were materially false and misleading in that they omitted to state that the appraisals were inaccurate because: (i) the appraisers were not independent from Countrywide, which exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values; (ii) the actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser as represented in the Offering Documents; and (iii) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated.

**C.    Defendants Materially Misrepresented The Accuracy Of The Credit Ratings Assigned To The Certificates**

188.    Defendants represented in the Offering Documents that over 93% of the Certificates purchased by Plaintiffs were worthy of being rated "AAA," signifying that the risk of loss was virtually non-existent.  Defendants represented that the remaining Certificates were worthy of being rated investment grade – "AA" or "A" – signifying that the risk of loss was minimal.

189.    By providing ratings, Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected Countrywide's underwriting guidelines and practices, and the specific qualities of the underlying loans.  As stated in detail above, ¶¶ 36-145, this representation was false.

190.    Defendants further represented in the Prospectus Supplements, in sum or substance, that:

> It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") and "Aaa" by Moody's Investors Service, Inc. ("Moody's").  It is a condition to the issuance of the Class M, Class B-1 and Class B-2 Certificates that they be rated at least "AA", "A" and "BBB", respectively, by S&P and that they be rated at least "Aa3," "A3" and "Baa2", respectively, by Moody's.
>
> *The ratings assigned . . . to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.*

191.    These statements regarding the ratings assigned to the Certificates were false because Defendants stated the assigned ratings while knowing that misleading information was

provided to the rating agencies by Countrywide to ensure AAA or otherwise investment grade ratings.

192.    The falsity of these statements is further evidenced by the rapid downgrades of nearly all of the Certificates within a few years of issuance, with over 90% of the Certificates downgraded to junk. *See* Exhibit 2.

**D.    Defendants Materially Misrepresented Countrywide's Transfer Of Good Title To The Mortgage Loans To The Issuing Trusts**

193.    In sum or substance, Defendants stated in each Prospectus Supplement that:

> In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it. . . . Under the pooling and servicing agreement, *the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificateholders.*

194.    These representations were false because, as alleged in detail in ¶¶ 146-157, Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs.  These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.  The issuing trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in case of default.

**VII.    BECAUSE OF DEFENDANTS' FRAUDULENT CONDUCT, PLAINTIFFS HAVE SUFFERED LOSSES ON THEIR PURCHASES OF CERTIFICATES**

195.    The ratings on virtually all of the Certificates have since been downgraded and they are no longer marketable at the prices paid for them by Plaintiffs.  As reflected in the

attached Exhibit 2, which reflects the Certificates in which the Plaintiffs purchased interests, over 90% of the Certificates that were originally rated "AAA" have been downgraded to junk.

196.    Further, the delinquency, bank ownership and foreclosure rates on the underlying mortgages have soared since issuance. As reflected in the attached Exhibit 3, the average percentage of loans that are currently 30 days or more delinquent, in foreclosure, or bank-owned exceeds 31%.    In 31 of the Certificates in which the Plaintiffs purchased interests, the percentage of loans that are currently 30 days or more delinquent, in foreclosure, or bank-owned exceeds 50%, with an average delinquency of over 60%.   Moreover, these current performance numbers do not reflect the number of loans which have been foreclosed since issuance and which are no longer included within the loan pools.  Exhibit 3 reflects the original number of loans in the loan pools and the total number of loans which have been removed from the pools, largely due to either foreclosure or early payout, negatively impacting the income payable to Certificate-holders.

197.    Statistical studies by others have similarly revealed that the problems in mortgage loans were tied to the abandonment of underwriting standards.  The F.B.I. Mortgage Fraud Reports of 2007 (published in April 2008) reported on the results of a study of three million residential mortgages that found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  Loans containing egregious misrepresentations like the misrepresentations documented in the Countrywide loan pools were five times as likely to default in the first six months than loans that did not.

198.    Other parties' reviews of Countrywide's full loan files have revealed even greater deviations.  Third parties with access to the complete loan files for certain Countrywide securitizations have performed additional analysis of the mortgage loans underlying Countrywide's offerings.   These include, among others, MBIA and Syncora Insurance

Company ("Syncora").   Their analyses provide additional strong evidence that essential characteristics of the mortgage loans underlying Countrywide's MBS were misrepresented and omitted material information, and that the problems in Countrywide's underwriting practices were systemic.

199.    MBIA is a New York-based monoline insurer that wrote insurance on certain Countrywide mortgage-backed securities offerings.   MBIA conducted an investigation into Countrywide's loan files after it was asked to make payments to certain other investors.

200.    MBIA's analysis included an analysis of securitizations issued by two of the Depositor Defendants:   CWHEQ and CWABS.   MBIA found that the defective loans span Countrywide's securitizations from 2004 to 2007, demonstrating the consistency of Countrywide's disregard for its own underwriting guidelines over this period, the same period at issue in this case.   Because Countrywide's violation of its underwriting guidelines was a systemic problem, MBIA's findings are applicable to all of Plaintiffs' Certificates.

201.    In carrying out its review of the approximately 19,000 Countrywide loan files, MBIA found that 91% of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines.   MBIA's report showed that the loan applications frequently "(i) lack key documentation, such as verification of borrower assets or income; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or CLTV [combined loan-to-value] ratios, fails to meet stated Countrywide guidelines (without any permissible exception)."

202.    Syncora, another insurance company that insured Countrywide's securitizations, has conducted a similar re-review analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's

representations.   Syncora found that 75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines, lack any compensating factors that could justify their increased risk, and should never have been made."  Syncora's review is probative of the problems underlying Plaintiffs' Certificates because it again demonstrates that Countrywide's failures during this key period of 2004 to 2007 were systemic.

203.    Syncora gave examples of individual loans that diverged from Countrywide's guidelines. The individual defective loans analyzed by Syncora reflected a long list of misstatements by Countrywide.  Many loans violated the DTI ratios and LTV ratios set forth in Countrywide's underwriting guidelines, without adequate compensating factors to justify the increased risk of default, due in part to borrowers' exaggerated incomes and exaggerated property values.  Loan amounts routinely exceeded the maximum amounts permitted under the Company's guidelines for each given borrower, based on a borrower's credit score, documentation, and property values.  Countrywide also improperly issued loans to borrowers when their loan files lacked adequate documentation of the borrowers' income, assets, credit, employment, cash reserves, or property values.

204.    In addition, the Illinois Attorney General reviewed the sales of Countrywide loans by an Illinois mortgage broker and found that the vast majority of the loans had inflated incomes stated in the documentation, almost all without the borrowers' knowledge.  This study covered the time period of 2004 to 2007, again the same time period during which Countrywide was generating the loans at issue here.  Likewise, a review of 100 stated-income loans by the Mortgage Asset Research Institute revealed that 60% of the income amounts were inflated by more than 50% and that 90% of the loans had inflated income figures of at least 5%.  Again, this is highly probative of the problems underlying Plaintiffs' Countrywide Certificates as it covers the time period of 2004 to 2007.

## VIII.  AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA IS VICARIOUSLY LIABLE FOR COUNTRYWIDE'S ACTIONS

205.    As Countrywide's successor in liability, Bank of America is jointly and severally liable for any and all damages resulting to Plaintiffs from the wrongful actions of Countrywide. Bank of America itself has acknowledged that its acquisition of all of Countrywide's assets through an all-stock transaction on July 1, 2008 was a "merger."  In a July 2008 press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  According to Bank of America, it "anticipates substantial cost savings from combining the two companies," from eliminating employment positions, and from reducing overlapping technology, vendor and marketing expenses.  Desoer added that "the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."  Desoer was also interviewed for the May 2009 issue of *Housing Wire*, which reported that one of the assets [Bank of America] acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of BofA's mortgage operations over to Countrywide's platforms. Desoer was quoted as saying, "[w]e're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countrywide platforms." Mozilo stated in another press release that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."  And in its 2008 Annual Report, Bank of America confirmed that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined

company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners."

206.  Bank of America has reported to the SEC that on November 7, 2008, Countrywide Financial and Countrywide Home "transferred substantially all of their assets and operations to [Bank of America]."   This transfer of assets was "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations."   A California federal court recently found that since the merger, "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009."   And the New York Supreme Court has denied the defendants' motion to dismiss MBIA's and Syncora's – both monoline bond insurers – successor and vicarious liability claims against Bank of America based on Countrywide MBS.  Countrywide also ceased submitting filings to the SEC, which are now submitted as part of Bank of America's filings. Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

207.  A spokesperson for Bank of America confirmed: "We bought the company and all of its assets and liabilities."  Similarly, a January 23, 2009 *New York Times* article quoted Kenneth D. Lewis (who at the time was Bank of America's Chairman and CEO), acknowledging that Bank of America had factored Countrywide's liabilities into the price it paid to acquire Countrywide: "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

208.  Consistent with its assumption of Countrywide's liabilities, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by

agreeing to loan modifications for 390,000 borrowers, an agreement valued up to $8.4 billion. Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements. In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide. In announcing that its loan modification program, known as the National Homeowners Retention Program ("NHRP"), will now have a "principal forgiveness" component, Bank of America noted that it "developed and launched the NHRP to provide assistance to Countrywide borrowers."

209.   On January 3, 2011, Bank of America paid $2.8 billion to GSEs Freddie Mac and Fannie Mae to settle claims of misrepresentations on billions of dollars in loans that went sour after Fannie and Freddie bought them from Countrywide.  In exchange for the payments, Freddie Mac and Fannie Mae agreed to drop their demands that Bank of America buy back the mortgages.  The payment of $1.28 billion to Freddie Mac settled 787,000 loan claims (current and future) sold by Countrywide through 2008.  The payment of $1.34 billion (after applying credits to an agreed upon settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and other specific claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

210.   Upon information and belief, Bank of America has been operating Countrywide Home effectively as a division of Bank of America. To that end, on April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired." Bank of America advised that it is operating the Countrywide home loan and mortgage business as a "division" named Bank of America Home Loans, which "represents the combined operations of Bank of

America's mortgage and home equity business and Countrywide Home Loans." The Bank of America Home Loans division is headquartered at Countrywide's offices in Calabasas, California.

211.    Further, Bank of America's website states that "Countrywide customers ... have access to Bank of America's 6,100 banking centers." Countrywide's former website redirects customers to Bank of America's website.

## IX.    CAUSES OF ACTION FOR FRAUD

### FIRST CAUSE OF ACTION

**(Common Law Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants)**

212.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

213.    As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

214.    As a corporate parent, Countrywide Financial directed the activities of Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.

215.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

216.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Certificates.   Furthermore, these statements related to these Defendants' own acts and omissions.

217.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents, private placement memoranda, and their public representations, as described herein.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs would rely upon their representations in connection with Plaintiffs' decision to purchase the Certificates. Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

218.   It was only by making such representations that Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were able to induce Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

219.   Plaintiffs justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

220.   As a result of the false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages.

221.   Because Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including but not limited to all persons with interests in the Certificates, Plaintiffs are entitled to recover punitive damages.

## SECOND CAUSE OF ACTION

**(Fraudulent Inducement Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants)**

222.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

223.   As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

224.   This is a claim for fraudulent inducement against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.   As a corporate parent, Countrywide Financial directed the activities of Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.

225.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

226.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Certificates.   Furthermore, these statements related to these Defendants' own acts and omissions.

227.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations, as described herein. Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs would rely upon their representations in connection with Plaintiffs' decision to purchase the Certificates.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

228.    It was only by making such representations that Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were able to induce Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

229.    Plaintiffs justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

230.    By virtue of Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' false and misleading statements and omissions, as

alleged herein, Plaintiffs have suffered substantial damages and are also entitled to a rescission of the sale of the Certificates.

## THIRD CAUSE OF ACTION

**(Aiding And Abetting Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Home Loans Servicing, Countrywide Capital Markets, The Depositor Defendants, Mozilo And Sambol)**

231.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

232.    This is a claim against the above-named aiding and abetting Countrywide Defendants for aiding and abetting the fraud by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants. Each of these Defendants aided and abetted the fraud committed by all of the others among these Defendants.

233.    The above-named aiding and abetting Countrywide Defendants knew of the fraud perpetrated by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants on Plaintiffs. As alleged in detail above, each of the above-named aiding and abetting Countrywide Defendants knew that the Certificates were not backed by high quality loans and were not underwritten according to Countrywide Home Loans' underwriting standards, received internal reports about the violations of Countrywide Home Loan' mortgage loan underwriting and appraisal standards, participated in those violations and had actual knowledge of their own acts, or participated in and had actual knowledge of Defendants' failure to convey good title to the mortgage loans underlying the Certificates to the issuing trusts.

234.    Furthermore, the above-named aiding and abetting Countrywide Defendants provided Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants with substantial assistance in advancing the commission of the fraud. As

91

alleged in detail above, each of the above-named aiding and abetting Countrywide Defendants participated in the violations of Countrywide Home Loans' mortgage loan underwriting and appraisal standards, made false public statements about Countrywide Home Loans' mortgage loan underwriting and appraisal standards, provided false information about the mortgage loans underlying the Certificates to the credit rating agencies, provided false information for use in the Offering Documents, or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the issuing trusts.

235.   It was foreseeable to the above-named aiding and abetting Countrywide Defendants at the time they actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

236.   As a direct and natural result of the fraud committed by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants and the above-named aiding and abetting Countrywide Defendants' knowing and active participation therein, Plaintiffs have suffered substantial damages.

## FOURTH CAUSE OF ACTION

### (Successor And Vicarious Liability Against The Bank Of America Defendants)

237.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

238.   The Bank of America Defendants – BAC Home Loans Servicing, and NB Holdings – are jointly and severally liable for any and all damages resulting from the wrongful actions of Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide Capital Markets, as alleged herein, because it is the successor-in-interest to Countrywide Financial and is vicariously liable for the conduct of

Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide Capital Markets as a result of a de facto merger of the two entities.

239.   This acquisition was a de facto merger because Bank of America intended to take over and effectively took over Countrywide Financial and its subsidiaries in their entirety and, thus, should carry the liabilities of Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide Capital Markets as a concomitant to the benefits it derived from the purchase.

240.   The acquisition resulted in continuity of ownership – a hallmark of a de facto merger – because the shareholders of Countrywide Financial became shareholders of Bank of America as a result of Bank of America's acquisition of Countrywide Financial on July 1, 2008 through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide Financial.  Bank of America has described the transaction as a merger, and has actively incorporated the Countrywide's mortgage business into Bank of America.

241.   Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide Capital Markets – another hallmark of a de facto merger.  Among other things, the Countrywide brand has been retired and the old Countrywide website redirects customers to the mortgage and home loan sections of Bank of America's website.  On April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired."  Instead, Bank of America operated its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."  The integration of Countrywide Financial, Countrywide Home